UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| WORKGROUP TECHNOLOGY PARTNERS, INC., | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | 2:15-cv-00002-JAW |
| ANTHEM, INC., | ) ) ) | |
| Defendant. | ) | |

**ORDER ON MOTION TO DISMISS**

A license to use is not a license to steal.

## I.   BACKGROUND

### A.   Procedural History

On January 5, 2015, Workgroup Technology Partners, Inc. (Workgroup) filed a complaint against WellPoint, Inc. (WellPoint). *Compl. (Injunctive Relief Sought)* (ECF No. 1) (*Compl.*). Workgroup alleges, among other things, that WellPoint carried out a "fraudulent scheme" and "misappropriate[d] valuable and proprietary intellectual property and trade secrets belonging to Workgroup." *Id.* ¶ 1. On March 6, 2015, WellPoint filed a consented-to motion to change its party name to Anthem, Inc. (Anthem), and the Court granted the motion on March 9, 2015. *Consented-to Mot. to Change Party Name* (ECF No. 14); *Order* (ECF No. 17).

On March 6, 2015, Anthem filed a motion to dismiss. *Def. WellPoint, Inc.'s Mot. to Dismiss the Compl.* (ECF No. 15) (*Def.'s Mot.*). Workgroup responded in opposition on March 27, 2015. *Pl. Workgroup Tech. Partners, Inc.'s Obj. to Def.*

*Anthem, Inc.'s Mot. to Dismiss* (ECF No. 20) (*Pl.'s Opp'n*). On April 10, 2015, Anthem replied. *Def. Anthem, Inc.'s Reply in Supp. of its Mot. to Dismiss the Compl.* (ECF No. 23) (*Def.'s Reply*). On May 18, 2015, Workgroup filed a surreply. *Pl. Workgroup Tech. Partners, Inc.'s Surreply to Def. Anthem, Inc.'s Reply in Supp. of its Mot. to Dismiss* (ECF No. 30) (*Pl.'s Surreply*). Anthem responded on May 27, 2015. *Anthem's Resp. to Pl.'s Surreply to Anthem's Mot. to Dismiss* (ECF No. 31) (*Def.'s Resp. to Pl.'s Surreply*).

## B.   Factual Allegations Contained in Workgroup's Complaint[1]

### 1.   The Parties

Workgroup is a Maine corporation with its office and principal place of business in Westbrook, Maine. *Compl.* ¶ 6. Workgroup is an information technology company, which, among other things, develops and licenses software applications to clients in the health insurance industry. *Id.* ¶ 7. Anthem is an Indiana corporation with its office and principal place of business in Indianapolis, Indiana. *Id.* ¶ 8. Anthem is in the business of providing and administering health insurance plans. *Id.* ¶ 9.

### 2.   iAutomate

Workgroup develops, owns, and licenses business application software that automates a range of business processes, including claims recovery and subrogation for health insurance companies. *Id.* ¶ 12. This includes software known as iAutomate

---

[1]      Workgroup's Complaint refers to the Defendant as WellPoint. *See Compl.* On approximately December 3, 2014, the Defendant officially changed its name from WellPoint, Inc. to Anthem, Inc. *Consented-to Mot. to Change Party Name* at 1. Even though the relevant facts occurred before December 3, 2014, when the Defendant was still known as WellPoint, the Court refers to the Defendant as Anthem—its current name—except where the context requires a distinction between WellPoint and Anthem.

Recovery CaseManager ("iAutomate"). *Id.* ¶ 13. This software automates the process of analyzing health insurance claims data and pursues subrogation recovery opportunities against third parties. *Id.*

iAutomate functions on two server computers: (1) the iAutomate database server, which receives and processes large volumes of raw insurance claim data supplied by Workgroup's licensee and then analyzes the data using complex algorithms to identify potential subrogation recovery opportunities, and (2) an application server, which runs web-based application software that processes data generated by the database server in a user interface with a logical workflow and various tools that help licensed users analyze, manage, and pursue a large volume of subrogation claims. *Id.* ¶ 14. The database housed on the server ("Database Structure"), and the Claims Data Manager ("CDM"), which is a large package of algorithms and codes that sorts and analyzes raw insurance claims data, generates new analytical results ("Resulting Analytical Outputs") from the raw data and analyzes these outputs to identify potential subrogation recovery opportunities. *Id.* ¶ 15. The iAutomate web-based application software ("Application Attributes") individually and collectively facilitate iAutomate licensees' efficient analysis, management, and pursuit of subrogation recovery opportunities identified by the database server. *Id.* ¶ 17. Together, the database and application servers allow licensed iAutomate users to analyze and manage massive volumes of raw claims data and thereby maximize their subrogation recoveries. *Id.* ¶ 18.

3

Workgroup designed, developed, and refined iAutomate, including the Database Structure, CDM, Resulting Analytical Outputs, and Application Attributes, over more than fifteen years.  *Id.* ¶ 19.  The Database Structure, CDM, Resulting Analytical Outputs, and Application Attributes independently and collectively constitute valuable and proprietary intellectual property and trade secrets belonging to Workgroup.  *Id.* ¶ 21.

### 3.   Workgroup's iAutomate Licensing Relationship with WellPoint

On or about December 14, 2003, Anthem entered into a software license ("2003 Software License") with Sextant HealthCost Solutions (SHCS) for a subrogation claim identification software platform known as CaseMate, a predecessor to iAutomate.[2]  *Id.* ¶ 22.  In March 2008, Anthem and Workgroup entered into a supplement to the 2003 Software License ("2008 Supplement").  *Id.* ¶ 24.  The 2008 Supplement provided that Workgroup licensed iAutomate to Anthem and agreed, among other things, to maintain and service the iAutomate database server and application server on behalf of Anthem.  *Id.*  Furthermore, as provided under the 2008 Supplement, Anthem acquired only a right to use iAutomate for Anthem's "normal business purposes."  *Id.* ¶ 25.

Also under the terms of the 2008 Supplement, Anthem is required to maintain certain "Supplier Material" belonging to Workgroup "in strict confidence," and to "use

---

[2]      WellPoint's predecessor, also named Anthem, entered into the 2003 Software License with Sextant.  *Compl.* ¶ 24.  WellPoint and Workgroup subsequently succeeded to Anthem's and Sextant's interests.  *Id.* ¶ 25.  The corporate baton passing from entity to entity is not important to the resolution of the motion to dismiss, and the Court has referred to all the Anthem entities as Anthem.

4

such information solely in the course of performing its obligations hereunder, and to make no disclosure of such information except in accordance with the terms of this Agreement." *Id.* ¶ 27. "Supplier Material" is defined under the 2008 Supplement as all proprietary and/or intellectual property of Workgroup, including, without limitation, web designs, trade secrets, know-how, "software, algorithms, programming techniques, business rules, business methods, inventions, . . . processes, technology and designs," and the 2008 Supplement identifies "Supplier Material" as representing "Confidential Information." *Id.* ¶¶ 28-29. Workgroup says that the Database Structure, CDM, Resulting Analytical Outputs, and Application Attributes independently and collectively constitute Supplier Material and Confidential Information under the 2008 Supplement. *Id.* ¶ 31.

### 4. 2012: Anthem Switches from iAutomate to Subro 2000

According to Workgroup, in approximately 2012, Anthem replaced iAutomate with its own "in-house" subrogation claim identification and recovery solution, a legacy product owned by Anthem known as "Subro 2000." *Id.* ¶ 32. However, Workgroup believes that because Subro 2000 was written in an outdated program known as "visual basic," or "VB," Anthem needed to rewrite it in a newer programming language, ".NET," in order to be able to use and receive maintenance for the program. *Id.* ¶¶ 33-34. In addition, Anthem had to "migrate" all raw claims data (except for Resulting Analytical Outputs) housed on the iAutomate database server over to a database server associated with the rewritten Subro 2000 application.

*Id.* ¶ 35.  Anthem did not inform Workgroup of the decision to replace iAutomate with Subro 2000 when the decision was made.  *Id.* ¶ 36.

Workgroup alleges that, when compared with iAutomate, Subro 2000 lacked the functionality, scalability, and ability to efficiently process massive volumes of claims data, and therefore, merely rewriting Subro 2000 from VB to .NET programming language would not, in and of itself, address the shortcomings of Subro 2000 relative to iAutomate's unique capabilities.  *Id.* ¶¶ 37, 39.  Instead, according to Workgroup, Anthem devised a scheme to misappropriate the valuable and proprietary intellectual property and trade secrets in iAutomate that made it superior to Subro 2000, including the Database Structure, CDM, Resulting Analytical Outputs, and Application Attributes, and to build them into the rewritten .NET version of Subro 2000.  *Id.* ¶ 40.  Workgroup alleges that such action on the part of Anthem was not use for "normal business purposes" as contemplated under the 2008 Supplement.  *Id.* ¶ 41.  To carry out this scheme, Workgroup claims that Anthem hired Cognizant Technology Solutions (Cognizant), a Workgroup competitor, to "reverse engineer" the valuable and proprietary intellectual property and trade secrets in iAutomate, which Anthem wanted to misappropriate, and then incorporate into a .NET version of Subro 2000.  *Id.* ¶ 42.

     **5.**    **May and June 2013: Communications Between Workgroup and Anthem Regarding iAutomate and Subro 2000; Anthem Creates User Accounts for Cognizant Software Engineers**

Workgroup alleges that Anthem concealed its "scheme" by leading Workgroup to believe that Anthem intended to continue using iAutomate as its principal

subrogation claim identification and recovery solution while secretly giving Cognizant access to all the elements of iAutomate that Anthem wanted to misappropriate and incorporate into the .NET version of Subro 2000. *Id.* ¶ 44. In approximately April 2013, Anthem issued a request for proposals ("RFP") for a possible replacement to iAutomate. *Id.* ¶ 45. Before issuing the RFP, Anthem assured Workgroup that the RFP was a mere formality and that Anthem intended to use iAutomate as its principal subrogation claim identification and recovery solution. *Id.* ¶ 46. Workgroup says that at the time of the RFP, however, Anthem did not tell Workgroup it had hired Cognizant to write a .NET version of Subro 2000 using intellectual property and trade secrets belonging to Workgroup. *Id.* ¶ 48.

As a licensee, Anthem had the ability to create user accounts that gave users access to the iAutomate web-based application software for "normal business purposes." *Id.* ¶ 49. On May 20, 2013, Anthem created eight user accounts for Cognizant software engineers, some of whom are based in India, giving them unlimited access to the web-based application; Anthem did not inform Workgroup of this. *Id.* ¶¶ 50-51.

On May 22, 2013, during a monthly meeting between Anthem and Workgroup employees, Anthem informed Workgroup that it wanted to extend the term of the maintenance and support provisions of the 2008 Supplement. *Id.* ¶ 52. According to Workgroup, Anthem represented that it intended to continue using iAutomate as its principal subrogation claim identification and recovery solution. *Id.* ¶ 53. Anthem

did not tell Workgroup at this meeting that it was working with Cognizant or that it created eight user accounts for Cognizant software engineers. *Id.* ¶ 55.

On June 17, 2013, Anthem created four additional user accounts for Cognizant software engineers, all of whom are based in India, but did not inform Workgroup of this. *Id.* ¶¶ 56-57. Workgroup says that neither the creation nor purposes of these four and the other eight user accounts for Cognizant software engineers was a use of iAutomate for "normal business purposes." *Id.* ¶¶ 58-59.

> **6.    June 17, 2013 to September 30, 2013: Cognizant's Actions in iAutomate on Behalf of Anthem; Anthem and Workgroup Enter into a Two-Year Extension of the Maintenance and Support Provisions of the 2008 Supplement; Workgroup First Learns of Cognizant**

Between June 17, 2013 and September 30, 2013, Workgroup alleges that Cognizant software engineers took the following actions relating to iAutomate: (1) logged in to the web-based application software no fewer than 784 times; (2) executed tens of thousands of actions within the web-based application; and (3) systematically explored and tested the properties and characteristics of the iAutomate web-based application software as shown by audit records. *Id.* ¶¶ 60-63. According to Workgroup, these actions were not for "normal business purposes" within the meaning of the 2008 Supplement, demonstrate they intended to reverse engineer iAutomate for Anthem's benefit, and gave them access to and/or revealed Supplier Material and Confidential Information. *Id.* ¶¶ 64-66, 68. Anthem did not inform Workgroup that the Cognizant software engineers had accessed and explored iAutomate during this period. *Id.* ¶ 69. Instead, according to Workgroup, Anthem

8

falsely continued to lead Workgroup to believe that Anthem intended to continue using iAutomate as its principal subrogation claim identification and recovery solution. *Id.* ¶ 70.

On September 4, 2013, Anthem and Workgroup executed a two-year extension of the maintenance and support provisions of the 2008 Supplement. *Id.* ¶ 71. In executing this extension, Anthem did not inform Workgroup of the actions taken by Cognizant software engineers. *Id.* ¶ 72.

On September 17, 2013, Anthem sent a purchase order for the renewed maintenance and support term to Workgroup, and in the body of the purchase order, Anthem wrote that "work is underway with Cognizant to update the old Subro 2000 application." *Id.* ¶ 73. According to Workgroup, this was the first time it learned from Anthem that it hired Cognizant for any purpose as regards iAutomate. *Id.* ¶ 74. In addition, Workgroup alleges that Anthem omitted various details relating to Cognizant's use of iAutomate and intentionally hid Cognizant's "true role" in order to deceive Workgroup and further its scheme to misappropriate Workgroup's valuable and proprietary trade secrets and intellectual property. *Id.* ¶¶ 75-79.

### 7. The October 10, 2013 Teleconference

During an October 10, 2013 teleconference, an Anthem representative informed Workgroup that Anthem had decided to stop using iAutomate as its principal subrogation claim identification solution. *Id.* ¶ 80. The Anthem representative described his disclosure as a "bombshell" that he would need to report to his superiors, which Workgroup interpreted to mean that it was a disclosure that

9

Anthem had not intended to reveal to Workgroup. *Id.* ¶ 81. In addition, the Anthem representative revealed that Anthem had hired Cognizant to rewrite the Subro 2000 application software in the .NET language and to assist with migrating data from the iAutomate database server to a database server associated with Subro 2000. *Id.* ¶ 82.

In response, Workgroup expressed interest in supporting Anthem's transition from iAutomate to Subro 2000, especially by taking a lead role in the migration of raw data from the iAutomate database server to a Subro 2000 database server, and explained that this was due, in part, to protect its trade secrets and intellectual property contained in iAutomate from disclosure to Cognizant. *Id.* ¶¶ 83, 86. Workgroup says that during this same teleconference, Anthem assured Workgroup that Workgroup would play a central role in the transition from iAutomate to Subro 2000, including the data migration, and assured Workgroup that appropriate measures would be taken to protect Workgroup's trade secrets and intellectual property from disclosure to Cognizant. *Id.* ¶¶ 85, 87.

Despite these assurances, Workgroup alleges that Anthem still did not disclose that Cognizant had already taken numerous previously described actions on iAutomate, which Workgroup claims were intentionally withheld by Anthem to deceive Workgroup and further its scheme to misappropriate Workgroup's valuable and proprietary trade secrets and intellectual property. *Id.* ¶¶ 89-90.

### 8. October 2013 to February 2014 Events

Between October 2013 and February 2014, Workgroup alleges that it repeatedly asked Anthem for some "clear direction" regarding the transition from iAutomate to Subro 2000, and while Anthem repeatedly assured Workgroup it would provide such direction, Anthem failed to do so.  *Id.* ¶¶ 91-92.  Also during this time period, Workgroup claims that Anthem failed to disclose that it had also retained Cognizant to reverse engineer iAutomate and that Cognizant software engineers had taken numerous actions on iAutomate as previously described for purposes of furthering its scheme to misappropriate Workgroup's valuable trade secrets and intellectual property.  *Id.* ¶¶ 93-98.

In addition, according to Workgroup, in order to rewrite Subro 2000 in .NET programming language and to assist Anthem with data migration, it was unnecessary for Cognizant engineers to log in to the iAutomate web-based application software hundreds of times or take the tens of thousands of actions in the software. *Id.* ¶¶ 99-102.  Workgroup claims that nearly all of the more than 1,000 log-ins by Cognizant software engineers to the iAutomate web-based application software from June 2013 to July 2014 constituted false representations that the log-ins were for an authorized purpose and/or "normal business purposes."  *Id.* ¶ 105.

### 9.    2014: Anthem's Refusal to Provide Assurances Concerning Cognizant

At the beginning of February 2014, Anthem informed Workgroup that Workgroup's role in Anthem's transition from iAutomate to the Subro 2000 would be limited to providing "advisory" services that would assist Cognizant.  *Id.* ¶ 110. Workgroup also alleges that beginning in early 2014, Anthem began asking

Workgroup pointed technical questions about the structure and functioning of the Database Structure.  *Id.* ¶ 111.  Workgroup believes that these "pointed technical questions" originated from Cognizant engineers solely for reverse engineering.  *Id.* ¶ 112.

In March 2014, Workgroup sent a letter to Anthem to remind it of Workgroup's concerns regarding the confidentiality of iAutomate and to seek assurances that Anthem would be mindful of that confidentiality as it transitioned to Subro 2000, especially as Cognizant was involved in the transition process.  *Id.* ¶ 114.  In May 2014, counsel for Anthem informed Workgroup that it had not discovered any evidence of "inappropriate" use or disclosure of confidential or proprietary information belonging to Workgroup.  *Id.* ¶ 115.  In June 2014, after conducting an audit on Anthem's users on iAutomate, Workgroup found the access by and activities of the Cognizant engineers over the previous thirteen months.  *Id.* ¶ 116.

### 10.    Anthem's Refusal to Pay for Excess Users

Workgroup alleges that under the terms of the 2008 Supplement and a related 2013 amendment, Anthem could use up to 275 licenses for iAutomate.  *Id.* ¶ 119. However, Workgroup says that between April 2013 and July 2014, Anthem exceeded the authorized number by 73 licenses, and the only steps Anthem took to correct the problem were to deactivate the accounts of 80 users in July 2014.  *Id.* ¶¶ 120-21. When Workgroup demanded that Anthem pay for the license overage during the relevant time period, Anthem refused, saying it had since reduced its number of users to the authorized number of 275.  *Id.* ¶ 122.

### 11.    Damages

Workgroup requests injunctive relief, claiming that Anthem caused irreparable damage to Workgroup and to the value of iAutomate, especially by giving Cognizant, a competitor of Workgroup, virtually unlimited access to the program.  *Id.* ¶¶ 123-28.  It also seeks economic damages, compensatory, consequential, and punitive damages, and attorney's fees and costs.  *Id.* at 28.

### C.    Counts in Workgroup's Complaint

### 1.    Count I: Breach of Contract

In Count I, Workgroup asserts a claim for breach of contract.  *Id.* ¶¶ 129-31.  It alleges that a breach occurred when Anthem (1) allowed Cognizant engineers access to Supplier Material and Confidential Information covered by the 2008 Supplement; (2) failed to ensure Cognizant engineers abided by the terms of the 2008 Supplement; (3) schemed to misappropriate iAutomate; and (4) refused to pay for user overages.  *Id.* ¶ 130.

### 2.    Count II: Unjust Enrichment

In Count II, Workgroup claims unjust enrichment.  *Id.* ¶¶ 132-35.  Workgroup claims that when Anthem granted Cognizant software engineers access to iAutomate for the purpose of reverse engineering and building its valuable and proprietary features into the .NET version of Subro 2000, Anthem created a valuable benefit for itself from Workgroup, and Workgroup has not been compensated for such benefit.  *Id.* ¶¶ 133-34.

### 3.    Count III: Uniform Trade Secrets Act

13

In Count III, Workgroup alleges a violation of the Maine Uniform Trade Secrets Act (MUTSA), 10 M.R.S. §§ 1541 *et seq.* *Id.* ¶¶ 136-44. According to Workgroup, elements of iAutomate, including the Database Structure, CDM, Resulting Analytical Outputs and Application Attributes, constitute "trade secrets" within the meaning of the statute. *Id.* ¶ 137. In addition, Workgroup says that it took reasonable steps to ensure the secrecy of these trade secrets and that Anthem acquired these trade secrets by improper means, including misrepresentation. *Id.* ¶¶ 138-39. Specifically, Workgroup repeats that Anthem disclosed trade secrets related to iAutomate through improper means to Cognizant and violated the secrecy and/or "normal business purposes" provisions under the 2008 Supplement, and in doing so, acted willfully and maliciously. *Id.* ¶¶ 141-43.

### 4. Count IV: Computer Fraud and Abuse Act

In Count IV, Workgroup asserts a violation of the Computer Fraud and Abuse Act (CFAA), 18 U.S.C. § 1030. *Id.* ¶¶ 145-54. Workgroup alleges that the iAutomate database server and application server are "protected computers" as defined in the CFAA and that Anthem, through Cognizant acting on its behalf, (1) intentionally accessed a protected computer without authorization and/or exceeded authorized access to a protected computer; (2) obtained information from a protected computer; (3) acted knowingly with intent to defraud Workgroup; (4) furthered its intended fraud and obtained information with value far in excess of $5,000; (5) intentionally accessed a protected computer and caused damage or loss in excess of $5,000; (6) trafficked in passwords or similar information through which a protected computer

was accessed without authorization and in a manner that affected interstate or foreign commerce; and (7) caused the potential modification of the medical care of one or more individuals.  *Id.* ¶¶ 146-54.

### 5.   Count V: Wire Fraud-Based Violations of the Racketeer Influence in Corrupt Organizations (RICO) Act

In Count V, Workgroup alleges a claim for wire fraud under the RICO Act, 18 U.S.C. §§ 1961 *et seq.*  *Id.* ¶¶ 155-64.  According to Workgroup, a confidential relationship existed between it and Anthem by virtue of the 2008 Supplement.  No later than May 2013, Anthem and Cognizant formed an "enterprise" within the meaning of 18 U.S.C. § 1961(4), which engaged in and/or conducted activities that affected interstate or foreign commerce.  *Id.* ¶¶ 156-58.  In addition, Workgroup alleges that no later than May 2013, Anthem conducted and/or participated in, directly or indirectly, the affairs of its enterprise with Cognizant through a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(1), specifically by causing or participating in repeated acts of wire fraud by means of wire, radio, or television communication in interstate or foreign commerce, in violation of 18 U.S.C. § 1343.  *Id.* ¶¶ 160-63.

### 6.   Count VI: Fraud

In Count VI, Workgroup alleges fraud.  *Id.* ¶¶ 165-68.  Workgroup says Anthem made misrepresentations and omissions with the intent to induce Workgroup to rely on them, thereby concealing its scheme to give Cognizant access to iAutomate for the purpose of misappropriating Workgroup's valuable and proprietary intellectual property and building it into the .NET version of Subro 2000.  *Id.* ¶ 166.  In addition,

Workgroup says it relied on Anthem's misrepresentations and omissions to its detriment and failed to discover Cognizant's access to and activities in iAutomate until long after Cognizant had taken substantial actions in furtherance of the alleged misappropriation.  *Id.* ¶ 167.

### 7.    Count VII: Trespass to Chattel

Finally, in Count VII, Workgroup asserts a claim for trespass to chattel.  *Id.* ¶¶ 169-72.  Workgroup claims that Anthem trespassed upon Workgroup's property, including by granting unauthorized and virtually unfettered access to that property to Cognizant for Anthem's benefit.  *Id.* ¶ 171.  Workgroup says it has been damaged as a result of this alleged trespass, including through diminution of the value of iAutomate based on its exposure to examination, analysis, and copying by Cognizant, especially given that many of these software engineers are based in India where Workgroup says protections for such intellectual property are weak and cannot be assured.  *Id.* ¶ 172.

## II.    THE PARTIES' POSITIONS

### A.    Defendant's Motion

Anthem seeks dismissal of all counts contained in Workgroup's Complaint. *Def.'s Mot.* at 1.  In Anthem's view, Workgroup did not want to lose Anthem as a customer and decided to hold "Anthem's data hostage by refusing to cooperate with the transition and, when that didn't work, launched this lawsuit accusing Anthem of lying, cheating and stealing."  *Id.*

Anthem contends that it granted Cognizant's software engineers access to iAutomate because the agreements between Workgroup and Anthem expressly allowed Anthem to do so.  *Id.* at 2-3.  Anthem says that pursuant to Section 3.1 of the 2008 Supplement, "[Anthem's] agents, contractors, consultants, suppliers, customers and third-party service providers are authorized to exercise the rights granted to [Anthem] in this Section but only in direct furtherance of services provided to [Anthem]."  *Id.* at 3 (quoting *Def.'s Mot.* Attach. 2 *2008 Supplement to Software License Agreement* § 3.1 (*2008 Supplement*)) (internal quotation marks omitted).  According to Anthem, that section also authorized it and "its contractors to use iAutomate in 'development environments, testing environments and disaster recovery environments' as well as for '[Anthem's] normal business purposes.'"  *Id.* (quoting *2008 Supplement* § 3.1).  Furthermore, it says that Section 8.1 of the 2008 Supplement provides that Anthem "may from time to time hire outsourcers, subcontractors, consultants, or other third Parties . . . to perform services or provide products relating to [Anthem's] business."  *Id.* (quoting *2008 Supplement* § 8.1) (internal quotation marks omitted).  Anthem asserts that Section 8.1 also contemplated that "**nothing** in the Agreement shall restrict access by such persons to the Software and/or services, as applicable as reasonably required for such Third Party Contractors to perform functions for and on behalf of [Anthem]."  *Id.* (quoting *2008 Supplement* § 8.1) (internal quotation marks omitted) (emphasis in Anthem's original).

17

In short, Anthem argues that "the few 'wrongful' facts that Workgroup alleges—access to iAutomate using contractors for the purpose of transitioning from iAutomate—are allowed under the Contract, while the rest of Workgroup's Complaint reduces to conclusions and speculation." *Id.* at 4.

### 1.  Count I: Breach of Contract

Anthem accuses Workgroup of misrepresenting the express terms of their contract agreement. *Id.* at 5. Specifically, it says that Section 3.1 of the 2008 Supplement is "phrased as grants and acknowledgments by 'Supplier,' *i.e.* Workgroup, not restrictions on Anthem." *Id.* In its view, Section 3.1 allowed Anthem to use iAutomate by it "or by its contractors, not just for subrogation claims processing but also for development and testing purposes." *Id.* It also directs the Court's attention to the language contained in Section 8.1. *Id.* at 5-6 ("nothing in the Agreement shall restrict access by such persons to the Software and/or services, as applicable as reasonably required for such Third Party Contractors to perform functions for and on behalf of [Anthem]"). These provisions, Anthem says, mean that "to the extent . . . Workgroup's claim rests on Anthem's migration of its data out of iAutomate, that claim fails under the Contract's plain language." *Id.* at 6.

Next, Anthem argues that none of the alleged "breaches" by Workgroup supports a plausible claim. *Id.* As regards Workgroup's claim that Anthem participated in a "scheme" to "misappropriate" information from iAutomate, Anthem counters that the claim is based entirely on Anthem and Cognizant's use of the software program, which was authorized under the 2008 Supplement. *Id.*

18

Workgroup does not allege, for example, "any facts indicating that Anthem (or Cognizant) copied any protected features of iAutomate into any software made by Anthem or Cognizant" or that Cognizant "makes and sells any competing software." *Id.*

Likewise, regarding Workgroup's claim that Anthem violated the "Supplier Material" and "Confidential Information" provisions of the 2008 Supplement, Anthem replies that third-party users, like Cognizant, are authorized to use iAutomate in the same fashion as Anthem pursuant to the 2008 Supplement, and Workgroup has not alleged that Cognizant accessed information that Anthem did not already have access to. *Id.* at 6-7.

Third, in response to Workgroup's allegation that Anthem failed to ensure that Cognizant followed the confidentiality provisions of the 2008 Supplement, Anthem argues "the Complaint fails to allege any actual **facts** suggesting that Cognizant copied, disclosed or misappropriated Workgroup trade secrets." *Id.* at 7 (emphasis in original).

Lastly, regarding Workgroup's claim that Anthem breached its contract with Workgroup for "refusing to pay for user overages," Anthem says this allegation does not comply with Rule 8 because it is conclusory and because Workgroup fails to explain the categories of "users" as defined under Section 3.1.1 of the 2008 Supplement: "Workgroup fails to mention these distinctions, much less attempt to apportion its user account among these categories." *Id.* at 7-8.

### 2.   Counts II through VII: Economic Loss Doctrine

Anthem argues that the so-called economic loss doctrine prevents Workgroup from bringing the remaining counts in its Complaint. *Id.* at 8. It explains that the doctrine "generally bars tort recovery of purely economic damages, unaccompanied by personal injury or property damage, incurred based on a contractual relationship." *Id.* (citing *In re Hannaford Bros. Co. Customer Data Sec. Breach Litig.*, 671 F. Supp. 2d 198, 201 (D. Me. 2009); *Oceanside at Pine Point Condo. Owners Ass'n v. Peachtree Doors, Inc.*, 659 A.2d 267, 270 (Me. 1995); *Schmid Pipeline Constr., Inc. v. Summit Nat. Gas of Me., Inc.*, No. 1:13-cv-464-GZS, 2014 WL 3600437, at *4 n.4 (D. Me. June 22, 2014)). Here, it contends, Workgroup and Anthem "are two commercially sophisticated parties" who negotiated a contract that allocated risk, and therefore, "Workgroup may not 'supplement the contract with a tort remedy.'" *Id.* at 8-9 (quoting *Banknorth, N.A. v. BJ's Wholesale Club, Inc.*, 442 F. Supp. 2d 206, 213 (M.D. Pa. 2006)). In sum, it concludes that because "the very same conduct forms the basis for both contract and tort claims, the tort claims are barred by the economic loss rule." *Id.* at 9 (citing *Trico Equip., Inc. v. Manor*, Civil No. 08—5561 (RBK/KMW), 2011 WL 705703, at *3 (D.N.J. Feb. 22, 2011)).

### 3.  Counts II through VII: Rule 9(b)

Workgroup next argues that the heightened pleading requirement under Rule 9(b) applies to Counts II through VII. *Id.* First, it asserts that Rule 9(b) "facially applies" to Count V (wire fraud-based claims under RICO) and Count VI (fraud). *Id.* at 10. Second, it claims that Rule 9(b) applies to Count II (unjust enrichment) because "the action that makes the enrichment culpable is fraud." *Id.* at 10 (citing *N. Am.*

*Catholic Educ. Programming Found., Inc. v. Cardinale*, 567 F.3d 8, 15 n.3 (1st Cir. 2009)).  Third, it argues that Rule 9(b) applies to Count III (trade secrets) because it "is expressly premised on misappropriation or 'misrepresentation.'"  *Id.*  Fourth, it says Rule 9(b) applies to Count IV (CFAA) and Count VII (trespass to chattel) because they "are directly linked to and grounded in the same 'fraudulent scheme,' and therefore fall under the same pleading standard."  *Id.* (quoting *Hayduk v. Lanna*, 775 F.2d 441, 443-44 (1st Cir. 1985)).

In Anthem's opinion, none of the counts complies with Rule 9(b).  *Id.*  Anthem argues that because Workgroup's counts essentially allege "concealment," Anthem was under no duty to disclose absent a fiduciary or confidential relationship, *id.* at 10-11 (citing *Rared Manchester NH, LLC v. Rite Aid of N.H., Inc.*, 693 F.3d 48, 56 (1st Cir. 2012)), and it contends that a "[v]endor relationship[]" such as this one is not such a relationship.  *Id.* (citing *Eaton v. Sontag*, 387 A.2d 33, 37 (Me. 1978)).  In addition, Anthem asserts that Workgroup has not identified "who made specific statements, when, or to whom," or alleged how Workgroup's position changed to "its disadvantage based on those statements or how those misrepresentations caused its claimed losses (which it also never identifies)."  *Id.* at 11 (citing *Alt. Sys. Concepts, Inc. v. Synopsys, Inc.*, 374 F.3d 23, 29-30 (1st Cir. 2004)).

### 4.    Counts II through V and VII: Rule 12(b)(6)

Finally, Anthem explains why, in its view, Counts II through V and VII should be dismissed under Rule 12(b)(6) for failing to state a claim for which relief can be granted.  *Id.* at 12-21.

21

### a.   Count II: Unjust Enrichment

Anthem argues that "[t]he existence of a contract between the parties precludes a claim for unjust enrichment." *Id.* at 12-13 (collecting cases). It also contends that the unjust enrichment claim is preempted under the MUTSA. *Id.* at 13 (citing 10 M.R.S. § 1548).

### b.   Count III: Uniform Trade Secrets Act

Anthem states that to make out a claim under the MUTSA, "a plaintiff must allege the (1) 'misappropriation' of a (2) 'trade secret.'" *Id.* (quoting *Cianbro Cos. v. Uremovich*, No. 1:12-cv-00330-DBH, 2013 WL 795144, at *10 (D. Me. Jan. 28, 2013)). Citing a number of cases for the proposition that "a plaintiff must identify specific trade secrets that were misappropriated," Anthem argues that Workgroup "does not identify the specific trade secrets that Anthem supposedly misappropriated, including any particular feature that was (a) secret, and (b) misappropriated by Anthem and put into its own software." *Id.* at 14. In sum, it says "Workgroup's naked assertions, coupled with silence on key facts necessary to plead a [M]UTSA claim, require dismissal of that claim." *Id.* at 15.

### c.   Count IV: Computer Fraud and Abuse Act

Turning to Workgroup's Count IV claim under the CFAA, Anthem argues that Workgroup failed to plausibly allege the necessary elements of this claim because:

> (i) Anthem accessed **<u>its own computers</u>** (as opposed to Workgroup's computers), and acted within its contractual authority while accessing those computers; (ii) Workgroup alleges no damage to its own computers or software, or any other loss addressable under the CFAA; and (iii) Workgroup fails to plausibly allege any additional factor from subsection (c)(4)(A)(i).

*Id.* at 15-16 (emphasis in original).

### d.      Count V: Wire Fraud-Based Claims under RICO

Addressing Workgroup's Count V claim under the RICO statute, Anthem contends that Workgroup's allegations "are specifically authorized by the Contract and . . . Workgroup has not plausibly alleged an 'enterprise,' a 'pattern' of racketeering activity, or any injury directly related to the 'racketeering' conduct." *Id.* at 17 (citing *Giuliano v. Fulton*, 399 F.3d 381, 386 (1st Cir. 2005)). It says that other than making the claim that Cognizant's log-ins to the iAutomate web-based application were "fraudulent," Workgroup does not explain why such log-ins were fraudulent, particularly given that "Workgroup had agreed to provisions authorizing third-party contractors such as Cognizant to access the iAutomate system on Anthem's behalf." *Id.* at 18. Anthem also asserts that "Workgroup's conclusory assertion that Anthem and Cognizant 'formed an enterprise' is insufficient to support a RICO claim, especially in light of the other factual allegations in the Complaint," *id.*, and "Workgroup fails to plausibly allege that Anthem and Cognizant were conducting the affairs of the purported 'enterprise,' rather than simply their own affairs." *Id.* at 19 (citing *Richmond v Nationwide Cassel L.P.*, 52 F.3d 640, 645–46 (7th Cir. 1995)). Anthem also contends that Workgroup has not plausibly alleged a "pattern of racketeering activity" under either the so-called "closed-ended" or "open-ended" approaches. *Id.* at 19-20 (citations omitted). Finally, Anthem argues that "Workgroup has not plausibly alleged any present injuries, let alone a causal

connection between its vague claims of injury and the alleged predicate acts." *Id.* at 21.

### e.     Count VII: Trespass to Chattel

Lastly, Anthem contends that Workgroup's Count VII (trespass to chattel) claim must fail because "Workgroup has not alleged that Anthem or [Cognizant] used or intermeddled with iAutomate without authorization." *Id.*  It also argues that this claim is preempted by the MUTSA.  *Id.* (citing 10 M.R.S. § 1548).

### B.     Plaintiff's Opposition

In response, Workgroup counters that Anthem's motion misses the mark because Anthem relies on the "false premise that the license agreement allowed it to reverse engineer iAutomate and share its proprietary and confidential features with Workgroup's competitor." *Pl.'s Opp'n* at 1.

### 1.     Count I: Breach of Contract

Workgroup argues it has plausibly alleged that Anthem breached the license it was granted under the 2008 Supplement by alleging that (1) Anthem reverse engineered iAutomate; and (2) Sections 3.1 and 8.1 of the 2008 Supplement did not allow Anthem to reverse engineer iAutomate (i.e., reverse engineering is not a "normal business purpose" under Section 3.1, and Section 8.1 cannot be interpreted to allow reverse engineering).  *Id.* at 2-4.  Workgroup also contends that it has plausibly alleged that Anthem breached the confidentiality provisions under the 2008 Supplement; specifically, that Cognizant software engineers "did not have an 'absolute need to know' ["Confidential Information" within the meaning of the 2008

Supplement] for the work Anthem claimed (and still claims) they were doing," and again, Workgroup says the Complaint plausibly alleges that Confidential Information was not to be disclosed for purposes of reverse engineering.  *Id.* at 4-5 (quoting *2008 Supplement* § 6.2).

Next, Workgroup asserts that it has plausibly alleged that Anthem breached the 2008 Supplement by exceeding the "authorized number of users," which it claims is inferred by the allegation that Anthem deactivated eighty users after Workgroup alerted it of the overage, thereby coming into compliance with the 2008 Supplement. *Id.* at 6.  It also counters that despite Anthem's argument that Workgroup's claim fails because it did not address what types of "users" were contemplated by the 2008 Supplement, identifying that distinction is not fatal because "the Complaint alleges that the total number of Users exceeded the authorized limit.  That is all that is necessary to state a claim at this stage."  *Id.*

### 2.    Count II: Unjust Enrichment

Workgroup explains that it pleaded its unjust enrichment claim in the alternative to its breach of contract claim, as is permitted under Rule 8(d), and thus, "the unjust enrichment count should not be dismissed merely because a breach of contract claim has also been pleaded, . . . or because it ultimately may be susceptible to a preemption argument under [MUTSA]."  *Id.* at 16 (citing *Fitzpatrick v. Teleflex, Inc.*, 630 F. Supp. 2d 91, 106 (D. Me. 2009); *Alpha Pro Tech., Inc. v. VWR Int'l LLC*, 984 F. Supp. 2d 425, 447-48 (E.D. Pa. 2013)).

### 3.    Count III: Maine Uniform Trade Secrets Act

As regards its Count III claim for violation of the MUTSA, Workgroup argues that the "Complaint puts Anthem on ample notice of what is being claimed as a trade secret, and how Workgroup believes it was misappropriated." *Id.* at 17. That is, the Database Structure, CDM, Resulting Analytical Outputs, and Application Attributes were trade secrets that Workgroup intended to keep confidential, and Anthem misappropriated these features of iAutomate for its own benefit. *Id.* Workgroup also states that "Anthem has not cited, and Workgroup . . . is not aware of, any Maine case law requiring that a misappropriation of trade secrets claim under [MUTSA] be pleaded with heightened specificity in order to survive a motion to dismiss." *Id.* Workgroup directs the Court to cases from other jurisdictions that have refused to apply heightened pleading standards to trade secret claims. *Id.* at 18 (collecting cases). It also notes that the cases relied upon by Anthem are misleading because some of the rulings came from "later procedural stages," and for those that occurred at the motion to dismiss stage, Workgroup argues "the allegations in the complaints in those cases were so non-specific that the defendant was not able to determine what was being alleged as a trade secret that had been misappropriated." *Id.* at 18-19 (citations omitted). In Workgroup's view, what makes this case distinguishable is that it identifies the components of iAutomate in its Complaint that it considers to be trade secrets and it alleges what it believes Anthem did with those trade secrets. *Id.* at 19-20.

### 4.    Count IV: Computer Fraud and Abuse Act

Addressing its Count IV claim under the CFAA, Workgroup highlights the elements necessary to make out such a claim and concludes that the "Complaint alleges a plausible cause of action under each of the CFAA provisions." *Id.* at 20-21. Workgroup goes on to explain in some detail how each of the provisions is satisfied by the allegations in its Complaint. *Id.* at 21-23.

### 5.    Count V: Wire Fraud-Based Violations of the RICO Act

Regarding its Count V claim under the RICO Act, Workgroup argues that the Complaint plausibly alleges this claim:

> The Complaint alleges that Anthem and Cognizant associated with each other for the purpose of reverse engineering iAutomate, each for their own benefit, and carried out the business of their association-in-fact through repeated acts of wire fraud lasting more than a year.

*Pl.'s Opp'n* at 23.  Workgroup goes on to explain in some detail how each element of a wire fraud claim under the RICO Act is satisfied by the allegations in the Complaint. *Id.* at 23-24.

### 6.    Count VII: Trespass to Chattel

Workgroup argues that its Count VII claim for trespass to chattel survives for the same reasons it contends Count I survives.  *Pl.'s Opp'n* at 7.  In addition, it says that even assuming the MUTSA preempts this claim, Count VII should not be dismissed on this basis "at this stage where pleading in the alternative is expressly permitted under" Rule 8.  *Id.* (citing *Alpha Pro Tech.*, 984 F. Supp. 2d at 447-48).

### 7.    Counts II through VII: Economic Loss Doctrine

In response to Anthem's claim that the economic loss doctrine bars Counts II through VII, Workgroup counters that:

> Maine courts have recognized the doctrine as barring tort claims for damages that a defective product causes to itself, and for damages sustained by a party to a service contract where the services provided did not meet contracted-for standards.   This case is neither of those.   Even if it were possible for the economic loss doctrine to apply, moreover, it would be too early in this case for the Court to make that determination.

*Id.* at 7-8 (collecting cases).   It also argues that courts in Maine and elsewhere do not typically apply the economic loss doctrine to cases where a plaintiff alleges an intentional tort such as fraudulent misrepresentation or misappropriation of trade secrets.   *Id.* at 8-10 (collecting cases).   However, Workgroup acknowledges that this Court has previously stated in *American Aerial Services, Inc. v. Terex USA, LLC*, 39 F. Supp. 3d 95, 110 (D. Me. 2014) that it remains an "open question" whether Maine would apply the doctrine to a case involving fraud.   *Pl.'s Opp'n* at 10.   Nevertheless, Workgroup urges the Court to conclude that the Maine Supreme Judicial Court would hold that the economic loss doctrine does not apply to its case.   *Id.* at 10-11. Alternatively, Workgroup contends that even if the Court concluded that the economic loss doctrine could apply to one or more of these counts, "it would be premature for the Court to dismiss those claims under the doctrine."   *Id.* at 11-12 (collecting cases).   In addition, Workgroup asserts that it is permitted under Rule 8(d) to "plead alternative and even inconsistent actions at the outset of a case, particularly where there appears to be a dispute about the scope of the contract at issue."   *Id.* at 12 (citing *IDT Corp. v. Unlimited Recharge, Inc.*, No. CIV.A. 11-4992 ES, 2012 WL 4050298, at *6 (D.N.J. Sept. 13, 2012)).

### 8.    Counts II through VII: Rule 9(b)

28

In response to Anthem's Rule 9(b) assertion, Workgroup counters that its Complaint does comply with the Rule, and pursuant to Maine law, "these allegations support claims of fraud by affirmative false statements and by a failure to disclose." *Id.* at 13.  In addition, Workgroup contends that a failure to disclose can support a fraud claim absent a fiduciary or special relationship where a plaintiff alleges "'active concealment of the truth.'"  *Id.* at 14 (quoting *Rared*, 693 F.3d at 54).  Workgroup explains that, in its view, it plausibly alleged that Anthem committed fraud by actively concealing "Cognizant's conduct and Anthem's true intentions."  *Id.*

### C.   Defendant's Reply

In reply, Anthem repeats that "Workgroup fails to point to a single fact showing that Anthem, or its contractor, copied *any* aspects of iAutomate, much less anything entitled to legal protection," and argues that "Workgroup's Complaint fails to allege what was supposedly taken, who took it, how it was misused, or how Workgroup has been damaged . . . ."  *Def.'s Reply* at 1 (emphasis in original).  Anthem also repeats its argument that the contract expressly allowed it to take the actions that form the bases of Workgroup's Complaint, and observes that "Workgroup tacitly admits, neither Anthem nor [Cognizant] ever had access to the source code," which would allow either to copy iAutomate.  *Id.* at 1-2.  It accuses Workgroup of "merely invit[ing] this Court to read something nefarious into a transition process that the parties expressly contemplated in their negotiated agreement."  *Id.* at 2. Furthermore, Anthem also asserts that "while repeatedly labeling Cognizant a 'competitor,' and inviting the Court to conclude that Cognizant might misappropriate

Workgroup's software for a competing offering, Workgroup fails to identify any Cognizant product that competes with iAutomate (because no such product exists)." *Id.*

As regards the economic loss doctrine, Anthem contends that it may still bar Workgroup's claims because "the Complaint fails to allege any duty owed by Anthem independent from the duties the parties contractually bargained for or any conduct different from the conduct that supports the alleged breach," and repeats that no "special relationship" existed between it and Workgroup to justify a "recovery in tort." *Id.* at 5.

Regarding Workgroup's MUTSA claim, Anthem repeats its assertion that "Workgroup fails to identify the portions of its iAutomate software that it claims are trade secrets" and argues that "Workgroup cannot punt its responsibility to specifically identify its trade secrets until after discovery." *Id.* at 6-8 (citing *Switch Commc'ns Grp. v. Ballard*, No. 2:11-cv-00285-KJD-GWF, 2012 WL 2342929, at *4-5 (D. Nev. June 19, 2012); *United Servs. Auto. Ass'n v. Mitek Sys., Inc.*, 289 F.R.D. 244, 248 (W.D. Tex. 2013)).

Anthem also urges the Court to dismiss the CFAA claim because, among other reasons, the alleged "protected computer" did not belong to Workgroup, and it observes that "Workgroup does not cite a single case where a CFAA claim was allowed to stand where the 'protected computer' belonged to the person accused of 'unauthorized access.'" *Id.* at 8. Such a result, in Anthem's view, would be "contrary to the purpose and language of the statute. *Id.*

30

Likewise, Anthem argues that Workgroup's RICO claim should be dismissed, asserting that Workgroup's allegations are merely a recitation of elements and that Workgroup "fails to cite a single case in support of its RICO claim, nor does it contest that the claim is subject to Rule 9(b)." *Id.* at 9. It also contends that Workgroup "fails to respond in any meaningful way to Anthem's arguments and fails to show how its allegations plausibly meet RICO's elements as applied by the First Circuit and other courts . . . ." *Id.* at 10.

Finally, regarding Workgroup's argument that its trespass to chattel claim survives because its breach of contract claim does, Anthem points out that "Workgroup cites no authority for the proposition that those two claims rise and fall together." *Id.* According to Workgroup, because Anthem does not "actually own[] the 'chattel' (the computers) at issue," the claim must fail. *Id.*

### D.     Plaintiff's Surreply

Workgroup disagrees that it was required to plead with the specificity that Anthem demands, and it believes it to be "improper for Anthem to invite the Court to draw unsupported factual inferences about the significance of iAutomate's 'source code' and similar technical matters at this stage of the case." *Pl.'s Surreply* at 2.

However, in the event the Court agrees with Anthem that the Complaint lacks specific allegations to survive Anthem's motion, Workgroup says "it has recently learned specific information that directly refutes Anthem's argument." *Id.* As a result, Workgroup asks that it be permitted to amend its Complaint to allege the following new facts:

31

- Anthem has marketed its updated "Subro 2000" subrogation software, which Anthem and Cognizant developed by using iAutomate as a template, to Workgroup's iAutomate customers specifically as an alternative to iAutomate;

- [T]he Subro 2000 user interface Anthem has demonstrated to Workgroup's customers is identical in material respects, including material functional respects, to iAutomate;

- Anthem's sales pitch to at least one Workgroup customer has included an untrue statement to the effect that Anthem transitioned away from iAutomate because iAutomate "didn't work";

- [W]ithin the past year Cognizant has begun marketing a new expertise in developing subrogation software, expressly citing its engagement with Anthem to develop Subro 2000 as the wellspring of its knowledge; and

- Cognizant has marketed its newfound expertise to Workgroup customers expressly as a means of implementing Subro 2000 as an alternative to iAutomate.

*Id.* at 3.  Workgroup argues these facts "further confirm the claims it has already adequately alleged . . . ." *Id.*

### E.    Defendant's Response to Plaintiff's Surreply

Anthem takes issue with Workgroup raising new factual allegations in its surreply rather than in its Complaint.  *Def.'s Resp. to Pl.'s Surreply* at 1.  However, Anthem contends that even if the Court entertains these new factual allegations, Workgroup "still fails to explain how they shore up any of the Complaint's pleading deficiencies."  *Id.*  According to Anthem, this is because Workgroup "does not make any new arguments showing how its old 'facts' add up to any plausible claim."  *Id.* at 2.

32

Also, Anthem asserts that while Workgroup "alleges that Anthem has marketed a competing product to Plaintiff's customers, [Workgroup] fails to name anyone from Anthem who did that marketing, any customer of Plaintiff who received it, when it happened, where it happened, or any of the other 'who, what, where and when' details required by Rule 9(b)." *Id.* at 3 (citing *Alt. Sys. Concepts*, 374 F.3d at 29). Furthermore, Anthem says that two of these new facts identified by Workgroup in its surreply "relate solely to activities of Anthem's contractor, Cognizant, a company that Anthem does not own or control," and Cognizant has not been joined as a defendant in this case. *Id.*

## III.   LEGAL STANDARD

According to Rule 8(a), "[a] pleading that states a claim for relief must contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a)(2). The United States Supreme Court has observed that "the pleading standard Rule 8 announces does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). However, Rule 12(b)(6) provides that a court may dismiss a complaint for "failure to state a claim upon which relief can be granted." FED. R. CIV. P. 12(b)(6). To survive a motion to dismiss, the plaintiff must plead "sufficient facts to show that he has a plausible entitlement to relief." *Sanchez v. Pereira-Castillo,* 590 F.3d 31, 41 (1st Cir. 2009) (citing *Iqbal*, 556 U.S. at 678).

Furthermore, where fraud is plead, "a party must state with particularity the circumstances constituting fraud . . . .   Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally."  FED. R. CIV. P. 9(b).

In *Schatz*, the First Circuit illuminated the proper analytic path:

> Step one: isolate and ignore statements in the complaint that simply offer legal labels and conclusions or merely rehash cause-of-action elements.  Step two: take the complaint's well-pled (*i.e.*, non-conclusory, non-speculative) facts as true, drawing all reasonable inferences in the pleader's favor, and see if they plausibly narrate a claim for relief.

*Schatz v. Republican State Leadership Comm.*, 669 F.3d 50, 55 (1st Cir. 2012) (internal citations omitted).  In addition, "when 'a complaint's factual allegations are expressly linked to—and admittedly depend upon—a document (the authenticity of which is not challenged),' then the court can review it upon a motion to dismiss."  *Alt. Energy, Inc. v. St. Paul Fire & Marine Ins. Co.*, 267 F.3d 30, 34 (1st Cir. 2001) (quoting *Beddall v. State St. Bank & Trust Co.*, 137 F.3d 12, 17 (1st Cir. 1998); *see also Trans-Spec Truck Serv., Inc. v. Caterpillar Inc.*, 524 F.3d 315, 321 (1st Cir. 2008) (explaining that a court may consider any documents attached to the complaint when ruling on a motion to dismiss, including any other documents "'integral to or explicitly relied upon in the complaint, even though not attached to the complaint'") (quoting *Clorox Co. P.R. v. Proctor & Gamble Commercial Co.*, 228 F.3d 24, 32 (1st Cir. 2000)).

Although the Court must accept all factual allegations in the complaint as true, it is "not bound to credit 'bald assertions, unsupportable conclusions, and opprobrious epithets.'"  *Campagna v. Mass. Dep't of Envtl. Prot.*, 334 F.3d 150, 155 (1st Cir. 2003) (quoting *Dartmouth Review v. Dartmouth Coll.*, 889 F.2d 13, 16 (1st Cir. 1989),

*overruled on other grounds by Educadores Puertorriqueños en Acción v. Hernández,* 367 F.3d 61, 64 (1st Cir. 2004)). Instead, "plaintiffs are obliged to set forth in their complaint 'factual allegations, either direct or inferential, regarding each material element necessary to sustain recovery under some actionable legal theory.'" *Dartmouth Review*, 889 F.2d at 16 (quoting *Gooley v. Mobil Oil Corp.*, 851 F.2d 513, 515 (1st Cir. 1988)).

## IV.   DISCUSSION

### A.   Count I: Breach of Contract

In Maine, the elements of breach of contract are: "(1) breach of a material contract term; (2) causation; and (3) damages." *Me. Energy Recovery Co. v. United Steel Structures, Inc.*, 1999 ME 31, ¶ 7, 724 A.2d 1248. Workgroup referenced the contract in its Complaint, and Anthem attached it to its motion; as the terms of the contract are integral to the pleadings, the Court will consider the terms in evaluating the motion to dismiss.[3] *Alt. Energy*, 267 F.3d at 34; *Trans-Spec Truck Serv.*, 524 F.3d at 321.

### 1.   Analytic Tools

Under Maine law, courts construe contracts "in accordance with the intention of the parties, which is to be ascertained from an examination of the whole

---

[3]      At the hearing on the motion to dismiss on January 21, 2015, *Min. Entry* (ECF No. 37), Anthem raised for the first time a contractual provision explicitly limiting liability. *Def.'s Mot.* Attach. 2 *2008 Supplement to Software License Agreement* § 7.5.  Because Anthem failed to properly present the argument, the Court will not address it here. *United States v. Pizarro-Berrios*, 448 F.3d 1, 5-6 (1st Cir. 2006) ("[E]xcept in extraordinary circumstances, arguments not raised in a party's initial brief and instead raised for the first time at oral argument are considered waived") (citing *Piazza v. Aponte Roque*, 909 F.2d 35, 37 (1st Cir.1990)).  This ruling does not foreclose Anthem from raising the issue at a later stage of the litigation.

instrument." *Middlesex Mut. Assurance Co. v. Fish*, 738 F. Supp. 2d 124, 136 (D. Me. 2010) (quoting *Am. Prot. Ins. Co. v. Acadia Ins. Co.*, 2003 ME 6, ¶ 11, 814 A.2d 989). "Determining whether or not a contract is ambiguous is a question of law." *Am. Prot.*, 2003 ME 6, ¶ 11, 814 A.2d 989. "Contract language is only 'ambiguous when it is reasonably susceptible [to] different interpretations.'" *Camden Nat'l Bank v. S.S. Navigation Co.*, 2010 ME 29, ¶ 16, 991 A.3d 800 (alteration in original) (quoting *Am. Prot.*, 2003 ME 6, ¶ 11, 814 A.2d 989). If a court determines that a contract is unambiguous, "its interpretation is also a question of law." *Am. Prot.*, 2003 ME 6, ¶ 11, 814 A.2d 989 (citing *Acadia Ins. Co. v. Buck Constr. Co.*, 2000 ME 154, ¶ 7, 756 A.2d 515) "On the other hand, if the contract is ambiguous, then 'its interpretation is a question of fact for the factfinder.'" *Id.* (quoting *Acadia Ins. Co.*, 2000 ME 154, ¶ 7, 756 A.2d 515).

"The interpretation of an unambiguous contract 'must be determined from the plain meaning of the language used and from the four corners of the instrument without resort to extrinsic evidence.'" *Id.* (quoting *Portland Valve Inc. v. Rockwood Sys. Corp.*, 460 A.2d 1383, 1387 (Me. 1983)). "[A] contract should 'be construed to give force and effect to all of its provisions' and not in a way that renders any of its provisions meaningless." *Id.* ¶ 12 (quoting *Acadia Ins. Co.*, 2000 ME 154, ¶ 9, 756 A.2d 515). To do so, "[a]ll parts and clauses must be considered together that it may be seen if and how one clause is explained, modified, limited or controlled by the others." *Id.* ¶ 11 (quoting *Peerless Ins. Co. v. Brennon*, 564 A.2d 383, 384-85 (Me. 1989)).

### 2.    The 2003 Contract

Paragraph 1 of the original contract provides in part:

1.  Grant of License.  Licensor hereby grants to Anthem a worldwide, perpetual, nonexclusive license to the software listed on the Attachment to this Agreement (the "Software") pursuant to the terms and conditions set forth in this Agreement.

*Def.'s Mot.* Attach 1 *Software License dated Dec. 19, 2003*, at 2   (*2003 Contract*).

Paragraph 2 provides in part:

2.  Permitted Uses.  Anthem shall be permitted to use the software: 1) for its own business; 2) to support an acquired company . . .; and 3) to support an affiliate . . . .

*Id.* Paragraph 8 provides in part:

8.  Ownership of Data and Records.

a) Software.  Title to, ownership of and intellectual property rights in the Software (including, without limitation, all object code, source code, copyrights, patent rights, and other intellectual property rights related thereto), the Documentation, Proprietary Information (as defined below) and all copies thereof shall be and at all times remain with Licensor.  All rights not expressly licensed herein are reserved to Licensor.  Anthem hereby acknowledges that this Agreement is a license agreement and not an agreement for sale. . . .  Anthem shall be entitled to retain copies of documentation for so long as this license is in effect.  Anthem will display [Workgroup]'s copyright notice on all copies of the Software.

b) Data and Records.  Licensor acknowledges and agrees that it receives no ownership rights in the materials, data or records furnished by Anthem.  Except as specifically authorized by Anthem in writing, Licensor will not disclose Anthem's data to a third party or make any other use of Anthem's data.

*Id.* at 4.

### 3.    Schedule 1 to the Master Software License

A Schedule 1 was attached to the 2003 contract. *Defs.' Mot.* Attach. 1 *Schedule 1 to Master Software License*, at 8-9 (*Schedule 1*). It contained a paragraph on limitations of use:

> Limitations on Use: The initial license is for 40 unique users. Licensing for additional users may be obtained as described below. A unique user shall be an individual who uses the Software in a production capacity. In addition Anthem shall be permitted to grant access to individuals on a "view only" basis. The number of individuals with view only access shall not exceed three times the number of unique users. Anthem's technology support staff shall be permitted to access the software without being counted as a user.

*Id.* at 1. Schedule 1 contained a list of charges if Anthem elected to purchase access for additional unique users. *Id.*

### 4.   The 2008 Supplement

Section 3.1 of the 2008 Supplement provides:

> Supplier hereby grants [Anthem] a perpetual, nonexclusive, enterprise-wide, non-transferable (except as provided herein), irrevocable, royalty-free, fully paid-up, worldwide right and license (the "License") to access and use (including without limitation via remote access) the Software and all related documentation (the "Documentation"). Supplier acknowledges and agrees that (i) the Software may be accessed and used by 260 users on [Anthem] computers or equipment, as well [as] any other computers owned, leased or otherwise used by [Anthem], its employees or agents that are electronically linked to [Anthem]'s servers; (ii) subject to the terms hereof, [Anthem]'s agents, contractors, consultants, suppliers, customers and third-party service providers are authorized to exercise the rights granted to [Anthem] in this Section but only in direct furtherance of services provided to [Anthem]; (iii) the Software may be accessed and used in development environments, testing environments and disaster recovery environments; and (iv) the Software shall only be used for [Anthem]'s normal business purposes which may include providing data processing services to third parties.

*Def.'s Mot.* Attach. 2 *2008 Supplement to Software License Agreement* § 3.1(a) (*2008 Suppl.*). This section also reiterates the original provisions concerning a unique user.

A "Unique User" is one "who uses the software in a production capacity. All other users are to be considered 'View Only' or 'Read Only' users. Three (3) View Only or Read Only Users equal one (1) Unique User for licensing consideration." *Id.* § 3.1.1.

Section 6.1 of the 2008 Supplement provides:

> **Supplier Materials.** In the course of Supplier's provision of Services to [Anthem], Supplier may provide proprietary information and/or intellectual property, including, but not limited to, technical data, creative designs and concepts, web designs, trade secrets and know-how, customer or Supplier lists and information, business plans, software, algorithms, programming techniques, business rules, business methods, inventions, drawings, engineering, hardware configuration information, marketing and strategic plans, financial data, processes, technology and designs which it maintains (the "Supplier Materials"). All Supplier Materials shall be deemed Confidential Information. Supplier does not grant [Anthem] any interests in, or ownership of, any of the Supplier Materials. Upon completion of the Services, [Anthem] shall promptly return all Supplier Materials in whatever stage of completion to Supplier and shall destroy (and provide written certification of such destruction) all [Anthem]'s files pertaining to the Supplier Materials including deletion of all such Supplier Materials from its hardware, files and systems except to the extent that supplier materials are included in the software purchased.

*Id.* § 6.1.

Section 8.1 of the 2008 Supplement provides:

> **Cooperation with and Access by Third Parties.** [Anthem] may from time to time hire outsourcers, subcontractors, consultants, or other third Parties ("[Anthem] Third-Party Contractors") to perform services or provide products relating to [Anthem]'s business, and which may be integrated with the Software and/or services, as applicable provided by Supplier hereunder (an "Integrated Project"). Supplier shall cooperate with and work in good faith with any [Anthem] Third-Party Contractor(s) as requested by [Anthem]. Such cooperation may include knowledge sharing of standards, policies, quality assurance and testing processes, as applicable, to ensure smooth deployment of Integrated Projects and/or the smooth and efficient transition of any Services (or component of Services) to, from, or among [Anthem], Supplier and any Third Party Contractor. Moreover, nothing in the Agreement shall

restrict access by such persons to the Software and/or services, as applicable as reasonably required for such Third Party Contractors to perform functions for and on behalf of [Anthem]; and provided that such Third Party Contractors shall use or access the Software and/or services, as applicable for [Anthem]'s benefit and shall have agreed to confidentiality provisions no less restrictive than those contained in this Agreement, and [Anthem] shall remain responsible for such Third Party Contractor's use or access to the Products and/or Services in accordance with the terms of this Agreement.  If any of the services described here are outside the scope of Supplier's typical service offerings, these additional services will be memorialized in a separate statement of work between the parties with mutually approved rates.

*Id.* § 8.1.

### 5.    The Court's Interpretation of the Contract Terms

The Court views the Workgroup-Anthem contract as garden variety licensing agreement.  Workgroup developed and owned certain valuable intellectual property consisting of complex algorithms, and Anthem had a business use for the Workgroup software.  Instead of purchasing the Workgroup software, Anthem licensed its use for Anthem's business purposes.  *2003 Contract* at ¶ 8 ("Anthem hereby acknowledges that this Agreement is a license agreement and not an agreement for sale").  Thus, the agreement stipulates that Workgroup remained the owner of the software.  *Id.* ("Title to, ownership of and intellectual property rights in the Software (including, without limitation, all object code, source code, copyrights, patent rights, and other intellectual property rights related thereto), the Documentation, Proprietary Information (as defined below) and all copies thereof shall be and at all times remain with Licensor").  The agreement allowed Anthem to make copies of the software but only during the term of the agreement.  *Id.* ("All copies made by Anthem of the Software are the property of the Licensor.  Anthem shall be entitled to retain copies

40

of the documentation for so long as this license is in effect"). The agreement required Anthem to post Workgroup's copyright notice on all copies of the software. *Id.* Schedule 1 and the 2008 Supplement restricted the number of Anthem employees who could use the software and required Anthem to pay more for broader employee access. *Schedule 1* at 1; *2008 Suppl.* § 3.1(a). The 2008 Supplement expressly described "Supplier Material" as confidential, owned by Workgroup, and to be returned to Workgroup upon termination of the contract. *2008 Suppl.* § 6.1. Finally, although the agreement allows Anthem to hire third parties to assist its use of the Workgroup software, the 2008 Supplement imposes confidentiality on those third parties. *Id.* § 8.1.

An examination of the whole instrument confirms that, viewing the allegations in the Complaint as true, Anthem did not have the legal authority to hire outside software experts to reverse engineer the Workgroup software, to unlock its algorithms, and to appropriate its confidential information. Anthem's emphasis on two clauses—one that allows Anthem to use the Workgroup software for "normal business purposes" and the other that allows third party contractors to "perform functions for and on behalf of" Anthem—ignores the overall context of the agreement itself under which Workgroup is licensing, not selling, the software for Anthem's use during the term of the contract. The Court rejects Anthem's claim that Count I, the breach of contract count, does not state a claim upon which relief may be granted.

### B.    Counts II Through VII: The Economic Loss Doctrine

Counts II through VII of the Workgroup Complaint allege tort and statutory claims against Anthem: (1) Count II, unjust enrichment, (2) Count III, the Uniform Trade Secrets Act, (3) Count IV, the Computer Fraud and Abuse Act, (4) Count V, the RICO Act, (5) Count VI, fraud, and (6) Count VII, trespass to chattel. *Compl.* at 22-27. Anthem maintains that these tort and statutory claims are precluded by the economic loss doctrine. *Def.'s Mot.* at 8-9.

The state of Maine adopted the economic loss doctrine in *Oceanside at Pine Point Condominium Owners Association v. Peachtree Doors*, 659 A.2d 267 (Me. 1995). In *Oceanside*, a construction company had installed windows and doors manufactured by Peachtree in a new condominium complex. *Id.* at 268. Following significant water damage, the condominium association and several owners sued Peachtree, alleging breach of contract and breach of warranty claims and several tort and statutory theories, including negligence, negligent misrepresentation, unfair trade practices, and strict liability. *Id.* Commenting that courts "generally . . . do not permit tort recovery for a defective product's damage to itself," the *Oceanside* Court concluded that absent a claim that the defective product caused personal injury or property damage to property other than the product itself, the purchaser may not proceed against the manufacturer for damages in tort. *Id.* at 270-71. "As explained in *Oceanside*, the rationale 'is that damage to a product itself means simply that the product has not met the customer's expectations, or, in other words, that the customer has received insufficient product value.'" *Gannett v. Pettegrow*, No. 03-CV-228-B-W, 2005 U.S. Dist. LEXIS 1357, at *18 (D. Me. Jan. 28, 2005) (quoting *Oceanside*, 659

A.2d at 270).  As the United States Supreme Court wrote in *East River Steamship Corp. v. Transamerica Delaval, Inc.*, 476 U.S. 858 (1986), "the tort concern with safety is reduced when an injury is only to the product itself."  *Id.* at 871.  Finally, the *Oceanside* Court defined "economic loss" within the meaning of this doctrine as "damages for inadequate value, costs of repair and replacement of defective product, or consequent loss of profits . . . ."  *Oceanside*, 659 A.2d at 270 n.4 (quoting *Moorman Mfg. Co. v. Nat. Tank Co.*, 435 N.E.2d 443, 449 (Ill. 1982)).

Preliminarily, the *Oceanside* Court allowed the statutory claim under the Maine Unfair Trade Practices Act (MUTPA) to proceed despite the applicability of the economic loss doctrine.  *Id.* at 272-73.  Even though Anthem has taken the position that the economic loss doctrine precludes statutory claims, *see Def.'s Mot.* at 8-9, it has cited no authority for that proposition.  Although the Court has found no Maine caselaw directly on-point, it has found cases where the economic loss doctrine applies but courts have nonetheless allowed statutory claims to proceed.  *See, e.g., Maine-ly Marine Sales & Serv., Inc. v. Worrey*, No. CV-04-369, 2006 Me. Super. LEXIS 79, at *9-10 (Apr. 10, 2006) (granting summary judgment on fraud and negligent misrepresentation claims under the economic loss doctrine but allowing plaintiff's MUTPA claim to proceed).  Thus, even if the economic loss doctrine applies to tort claims, the Court is not convinced that it bars all statutory claims.

Next, in *American Aerial Services, Inc. v. Terex USA, LLC*, 39 F. Supp. 3d 95 (D. Me. 2014), the United States District Court in Maine observed that "[i]t is generally accepted that the economic loss doctrine does not extend to claims of fraud

43

where the alleged misrepresentation is independent of the contract, such as claims of fraud in the inducement." *Id.* at 111 (citing *Marvin Lumber and Cedar Co. v. PPG Indus., Inc.*, 223 F.3d 873, 885 (8th Cir. 2000)). An exception may be where "the misrepresentation concerns the quality of the goods or product promised in the sales contract." *Id.* Here, however, Workgroup's fraud claim does not relate to the "quality of the goods or product" that it licensed to Anthem. To the contrary, taking Workgroup's allegations as true, Anthem misappropriated the Workgroup software not because it was defective but because it worked. Based on the allegations in the Complaint, the fraud count is not precluded by the economic loss doctrine and survives dismissal.

Moreover, the context for *Oceanside* is "product liability when a defective product does not cause personal injury or damage to other property." *Debbie Elliot, Inc. v. Hancock*, No. CV-05-280, 2005 Me. Super. LEXIS 146, at *3-4 (Oct. 27, 2005) (citing *Oceanside* 659 A.2d at 270-71). As the United States District Court for the District of Maine recently observed, "whether the [economic loss] doctrine applies beyond a product liability claim is uncertain." *Schmid Pipeline Constr.*, 2014 U.S. Dist. LEXIS 100435, at *9; *see In re Hannaford Bros.*, 671 F. Supp. 2d at 201.

The claim in this case is not a product liability claim. Nonetheless, the Workgroup-Anthem contract has a service aspect, and the Court assumes that the economic loss doctrine as interpreted in Maine might extend to service contracts. *See, e.g., Banknorth, N.A. v. MJ's Wholesale Club, Inc.*, 394 F. Supp. 2d 283, 287 (D. Me. 2005) ("Not all states have adopted the economic loss rule, and those that have vary

44

widely in their understanding of the doctrine's scope"); *Me. Rubber Int'l v. Envtl. Mgmt. Group, Inc.*, 298 F. Supp. 2d 133, 136 (D. Me. 2004) ("The difficult question is whether Maine would carve out an exception to the economic loss doctrine for professional services contracts"). Even so, for the economic loss doctrine to apply, the dispute must center on the subject of the contract. In *Schmid* and *Maine Rubber*, for example, the courts were careful to note that the economic loss doctrine barred the tort claims because the critical issue was the "value and quality of what was purchased." *Schmid*, 2014 U.S. Dist. LEXIS 100435, at *9 (quoting *Maine Rubber*, 298 F. Supp. 2d at 138). As the *Gannett* Court expressed the issue, the economic loss doctrine applies when the damage to the product means that it "has not met the customer's expectations, or, in other words, that the customer has received insufficient product value." *Gannett*, 2005 U.S. Dist. LEXIS 1357, at *18. This explanation of the economic loss doctrine's rationale is consistent with *Oceanside*'s definition of "economic loss," which is inapplicable to Workgroup's claim. *Oceanside*, 659 A.2d at 270 n.4 (economic loss refers to inadequate value, costs of repair, replacement of defective product, and consequent loss of profits).

Here, as claimed by Workgroup, Anthem's actions had nothing to do with the adequacy of Workgroup's performance of the contract itself. Instead, Workgroup alleges that Anthem hired experts to steal Workgroup's work product and appropriate it for Anthem's own use. In the context of this case, the Court concludes the economic loss doctrine does not bar the tort or statutory claims.[4]

---

[4]     Defendants submitted *Bowser v. MTGLQ Investors, LP*, No. 15-cv-154-LM, 2015 WL 4771337 (D.N.H. Aug. 11, 2015) in the run-up to the hearing on the motion to dismiss. *Notice of Suppl.*

### C.    The Rule 9(b) Heightened Pleading Requirement

Federal Rule of Civil Procedure 9(b) provides: "In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Anthem maintains that because Counts II through VII are based in fraud, the heightened pleading requirements of Rule 9(b) apply and that Workgroup has failed to meet those heightened requirements. *Def.'s Mot.* at 9-11. Again, Counts II through VII of the Workgroup Complaint allege tort and statutory claims against Anthem: (1) Count II, unjust enrichment; (2) Count III, the Uniform Trade Secrets Act; (3) Count IV, the Computer Fraud and Abuse Act; (4) Count V, the RICO Act; (5) Count VI, fraud; and (6) Count VII, trespass to chattel. *Compl.* at 22-27.

Anthem correctly observes that under First Circuit law if "fraud lies at the core of the action" or is the "lynchpin" of the claim, then Rule 9(b) applies. *Def.'s Mot.* at 9 (quoting *Hayduk v. Lanna*, 775 F.2d 441, 443 (1st Cir. 1985)). Rule 9(b) clearly applies to Count VI, which alleges fraud. *N. Am. Catholic Educ. Programming Found., Inc. v. Cardinale*, 567 F.3d 8, 14 (1st Cir. 2009) ("Count II is also a fraud claim, and so also subject to Rule 9(b)'s particularity requirement"). It also applies to Count V, the RICO Act count, because the count alleges wire fraud. *New England Data Servs., Inc. v. Becher*, 829 F.2d 286, 290 (1st Cir. 1987) ("We hold that Rule 9(b) requires specificity in the pleading of RICO mail and wire fraud"). The Court is less

---

*Authority* (ECF. No. 36).  Perhaps *Bowser* can be read to support a more expansive interpretation of the economic loss doctrine than the cited cases, but it was decided under New Hampshire law.  Because this case requires an application of Maine law, the Court must rely on Maine precedents especially in view of the limited pronouncements on the proper scope of the economic loss doctrine in Maine.

clear that the Rule 9(b) heightened pleading requirements apply to the statutory claims in Count III, the Uniform Trade Secrets Act, and Count IV, the Computer Fraud and Abuse Act.  The Court is skeptical that Rule 9(b) applies to Counts II, unjust enrichment, and Count VII, trespass to chattel.

Nevertheless, the Court need not rule on whether Anthem is correct in its broad assertions of Rule 9(b) applicability because in its view the Complaint meets the heightened pleading standards.   Here, Workgroup alleges that both before and after September 4, 2013—the date when Workgroup and Anthem executed a two-year extension of the maintenance and support provisions of the 2008 Supplement— Anthem had hired engineers from Cognizant Technology Solutions, a Workgroup competitor, to reverse engineer Workgroup's software in order to allow Cognizant to "build its critical features into replacement software for [Anthem]."  *Compl.* ¶ 3.  It also alleges that while Cognizant engineers were doing so, Anthem "concealed and misrepresented the true nature of their activities to Workgroup."  *Id.*

The Complaint claims that in 2012 Anthem resolved to replace the Workgroup program, iAutomate, with an in-house product owned by Anthem and called Subro 2000.  *Id.* ¶ 32.  However, merely migrating the data from iAutomate to Subro 2000 or rewriting the programming language would not have been successful because the value of iAutomate is in certain "valuable and proprietary intellectual property and trade secrets" that Workgroup had developed.  *Id.* ¶¶ 38-39.  Accordingly, Anthem retained Cognizant to "reverse engineer the valuable and proprietary intellectual

47

property and trade secrets contained in iAutomate . . . and incorporate them into a .NET version of Subro 2000." *Id.* ¶ 47.

Furthermore the Complaint alleges while this deliberate misappropriation of Workgroup's intellectual property was ongoing, Anthem continually misrepresented the true state of affairs to Workgroup. *Id.* ¶¶ 43-59. The Complaint sets forth numerous instances of Anthem misrepresentations or material omissions from early April 2013 through June 17, 2013. *Id.* ¶¶ 45-56. The Complaint alleges that between June 17, 2013 and September 30, 2013, Cognizant software engineers "logged in to the iAutomate web-based application software no fewer than 784 times" and "executed tens of thousands of actions within the web-based application." *Id.* ¶¶ 60-61. Following the September 4, 2013 contract extension with Workgroup, the Complaint says that on October 10, 2013, Anthem made a number of misrepresentations about Workgroup's role in transitioning to Cognizant and its desire and ability to protect Workgroup's intellectual property from discovery by its competitor. *Id.* ¶¶ 80-90. Then the Complaint states that from October 2013 to July 2014, Anthem misrepresented Cognizant's role in the transition and extracted further sensitive information from Workgroup under Cognizant's direction. *Id.* ¶¶ 91-117.

In the Court's view, Workgroup's 172-paragraph Complaint fully satisfies the Rule 9(b) requirements for heightened pleading in counts that sound in fraud. Although Anthem insisted at the hearing that Workgroup has not adequately alleged what was taken, who took it, how they took it, and what was done with it, the Court

is well satisfied that Workgroup's Complaint is sufficiently specific to satisfy Rule 9(b)'s directive to avoid the specter of "groundless claims" or "strike suits" needlessly damaging Anthem's reputation.  *New England*, 829 F.2d at 292.  As this section has recounted, Workgroup alleges that Anthem stole the iAutomate software; that Anthem hired Cognizant to assist in this theft; that Anthem accomplished the theft by reverse engineering a licensed software to create an in-house replacement; and that as a consequence, Anthem terminated its contract with Workgroup.  This is enough.  In arriving at this conclusion, the Court makes no comment on whether Workgroup will be successful in its claims against Anthem.  It only decides that the Complaint survives a Rule 9(b) challenge, and it thus avoids a dismissal that would deny Workgroup its day in court.  *Id.*

### D.   Implausibility Under Rule 8(a)

Anthem also maintains that the allegations in the Complaint fail to meet the plausibility standards in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007).  *Defs.' Mot.* at 12.

Pursuant to Rule 8(a), the plaintiff's complaint must set forth "a short and plain statement of the claim showing that the pleader is entitled to relief."  FED. R. CIV. P. 8(a)(2).  A "short and plain" statement needs only enough detail to provide a defendant with "'fair notice of what the . . . claim is and the grounds upon which it rests.'"  *Ocasio-Hernández v. Fortuño-Burset*, 640 F.3d 1, 12 (1st Cir. 2011) (quoting *Twombly*, 550 U.S. at 555).  "Despite the liberal pleading standard of Rule 8, to survive a motion to dismiss, a complaint must allege 'a plausible entitlement to

relief.'"  *Gallagher v. Cigna Healthcare of Me., Inc.*, 538 F. Supp. 2d 286, 290 (D. Me. 2008) (quoting *Twombly*, 550 U.S. at 559).

The Court disagrees with Anthem's contention that Workgroup's Complaint fails to comply with Rule 8(a) and views Anthem's disagreements with the allegations in the Complaint as a matter of proof, not pleading.

### E.    Count II: Unjust Enrichment

Anthem argues that Workgroup may not allege both a breach of contract and unjust enrichment.  *Id.* at 12-13.  Anthem is correct that if a valid contract is established, a plaintiff may not recover under both breach of contract and unjust enrichment theories.  *A.F.A.B., Inc. v. Town of Old Orchard Beach*, 639 A.2d 103, 105 n.3 (Me. 1994) ("Unjust enrichment describes recovery for the value of the benefit retained when there is no contractual relationship, but when, on the grounds of fairness and justice, the law compels performance of a legal and moral duty to pay") (quoting *Martin v. Campanaro*, 156 F.2d 127, 130–31 n. 3 (2d Cir. 1946); *Saunders v. Saunders*, 90 Me. 284, 289, 38 A. 172, 173 (1897); 66 AM. JUR. 2D *Restitution and Implied Contracts* § 166 (1973)).  But the notion that a plaintiff may not plead both breach of contract and unjust enrichment in the alternative "has no legs." *Fitzpatrick*, 630 F. Supp. 2d at 106, *aff'd* 630 F. Supp. 2d 91 (D. Me. 2009).

### F.    Count III: Uniform Trade Secrets Act

The state of Maine has enacted the Uniform Trade Secrets Act (MUTSA), 10 M.R.S. §§ 1541-48.  "A claim under the Uniform Trade Secrets Act requires a showing

of 'misappropriation,'[5] 10 M.R.S. § 1542(2), of a 'trade secret,'[6] *id.* § 1542(4)." *Cianbro Cos. v. Uremovich*, 1:12-CV-00330-DBH, 2013 U.S. Dist. LEXIS 29754, at *28 (D. Me. Jan. 28, 2013), *aff'd* 1:12-CV-00330-DBH, 2013 U.S. Dist. LEXIS 29703 (D. Me. Mar. 4, 2013).

Turning first to misappropriation, Anthem argues that, although Workgroup claimed that Cognizant used its software program thousands of times, Workgroup never alleged "that a single such use resulted in the actual taking of any secret information." *Def.'s Mot.* at 15.  Furthermore, Anthem asserts that the Complaint

---

[5]     Section 1542(2) of title 10 of the Maine Revised Statutes defines "misappropriation":

"Misappropriation" means:
　　A. Acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or
　　B. Disclosure or use of a trade secret of another without express or implied consent by a person who:
　　　　1)  Used improper means to acquire knowledge of the trade secret;
　　　　2)  At the time of disclosure or use, knew or had reason to know that his knowledge of the trade secret was:
　　　　　　i) Derived from or through a person who had utilized improper means to acquire it;
　　　　　　ii) Acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; or
　　　　　　iii) Derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use; or
　　　　3) Before a material change of his position, knew or had reason to know that it was a trade secret and that knowledge of it had been acquired by accident or mistake.

10 M.R.S. §1542(2).

[6]     Section 1542(4) of title 10 of the Maine Revised Statutes defines "trade secret":

"Trade secret" means information, including, but not limited to, a formula, pattern, compilation, program, device, method, technique or process, that:
　　A. Derives independent economic value, actual or potential, from not being generally known to and not being readily ascertainable by proper means by other persons who can obtain economic value from its disclosure or use; and
　　B. Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

10 M.R.S. §1542(4).

fails to state "a single Cognizant product that competes against Workgroup's iAutomate." *Id.* Comparing the allegations in the Complaint, however, to the MUTSA definition of "misappropriation," the Court readily concludes that Workgroup has alleged sufficient facts to fit within the statutory definition. Based on the allegations in the Complaint, Anthem had reason to know that Workgroup considered its iAutomate software program a trade secret and yet Anthem proceeded to violate the confidentiality provisions of its agreement with Workgroup, extract iAutomate's secrets, and use them to its commercial benefit.

Turning to the trade secret issue, the Maine Supreme Judicial Court explained in *Spottiswoode v. Levine*, 1999 ME 79, 730 A.2d 166 that "a court examining a claim under the [M]UTSA must determine whether the information at issue constitutes a 'trade secret' as that term is defined in 10 M.R.S. § 1542(4)." *Id.* ¶ 27 (footnote omitted). To constitute a "trade secret," "the information must: (1) derive 'independent economic value, actual or potential, from not being generally known [or] readily ascertainable'; and (2) be 'the subject of efforts that are reasonable under the circumstances to maintain its secrecy.'" *Id.* (footnotes omitted) (alterations in original) (quoting 10 M.R.S. § 1542(4)). In *Spottiswoode*, the Law Court listed five factors that a court may examine to determine whether the information constitutes a trade secret:

> (1) the value of the information to the plaintiff and to its competitors; (2) the amount of effort or money the plaintiff expended in developing the information; (3) the extent of measures the plaintiff took to guard the secrecy of the information; (4) the ease or difficulty with which others could properly acquire or duplicate the information; and (5) the degree to which third parties have placed the information in the public domain

or rendered the information 'readily ascertainable' through patent applications or unrestricted product marketing.

*Id.* ¶ 27 n.6 (citations omitted).

A fair reading of the Complaint confirms that Workgroup's software program had an independent economic value from not being generally known and that Workgroup attempted to protect that information from dissemination through the contract provisions. 10 M.R.S. § 1542(4). Even though all of the *Spottiswoode* factors are not set forth in the Complaint, the Court is satisfied that Workgroup has alleged sufficient facts to place its software program within the statutory definition of a trade secret. According to the Complaint, the inner workings of the Workgroup software program were the essence of the thing of value that Workgroup licensed to Anthem, who then went to unusual lengths to decode the Workgroup software program and to appropriate it as its own. The Complaint generally alleges that Workgroup took time, money, and effort to develop the software program, and there are numerous contractual provisions—ranging from restricted use access to Anthem's promise to maintain the information as confidential—whereby Workgroup attempted to protect the information from disclosure.

For purposes of the motion to dismiss, Workgroup has alleged sufficient facts to withstand dismissal of Count III, the MUTSA count.

## G.   Count IV: The Computer Fraud and Abuse Act, 18 U.S.C. § 1030

In Count IV, Workgroup has claimed that Anthem violated a federal statute, the Computer Fraud and Abuse Act (CFAA), 18 U.S.C. § 1030. Stating that to prove an action under the CFAA, a plaintiff must demonstrate "access of a computer

53

without authorization or access that exceeds authorization," Anthem contends that the "CFAA claim is deficient because (i) Anthem accessed **its own computers** (as opposed to Workgroup's computers), and acted within its contractual authority while accessing those computers; (ii) Workgroup alleges no damage to its own computers or software, or any other loss addressable under the CFAA; and (iii) Workgroup fails to plausibly allege any additional factor from subsection (c)(4)(A)(i)." *Def.'s Mot.* at 15-16 (emphasis in original). Workgroup responds that it is proceeding under a number of subsections of the CFAA: § 1030(a)(2)(C)—unauthorized access to and obtaining information from a protected computer; § 1030(a)(4)—knowing access to and obtaining information from a protected computer to commit fraud; § 1030(a)(5)(C)—unauthorized and intentional access to a protected computer to cause damage and loss; and § 1030(a)(6)(A)—knowing trafficking in a password to allow unauthorized access to a protected computer. *Pl.'s Opp'n* at 20-21.

Anthem's first point is that Workgroup has alleged that Anthem accessed its own computers and therefore there can be no CFAA violation. However, the language of the statute does not restrict the definition of "computer" to a computer not owned by the transgressor. The language in Workgroup's cited subsections is simply "a protected computer," "any computer," and "a computer"—not "a computer not owned by the accessor." *See* 18 U.S.C. §§ 1030(a)(2)(C) ("information from any protected computer"); § 1030(a)(4) ("a protected computer"); § 1030(a)(5)(C) ("a protected computer"); § 1030(a)(6)(A) ("a computer").

Furthermore, the CFAA recognizes two kinds of illegal access: (1) unauthorized access and (2) access that exceeds authorized access.  18 U.S.C. §§ 1030(a)(2), 1030(a)(4).[7]  "Congress defined 'exceeds authorized access', as accessing 'a computer with authorization and [using] such access to obtain or alter information in the computer that the access[o]r is not entitled to obtain or alter." *EF Cultural Travel BV v. Explorica, Inc.*, 274 F.3d 577, 583 (1st Cir. 2001) (quoting 18 U.S.C. § 1030(e)(6)).  Exceeding access appears to cover the situation where, as here, it is alleged that the accessor initially had the right to access the computer but went into an unauthorized part of the computer to obtain "proprietary information that goes beyond any authorized use." *Id.*

Following *EF Cultural*, however, two lines of authority have emerged among the district courts in the First Circuit; one line reads *EF Cultural* as endorsing a broader view of "exceeds authorized access," while the other labels any such endorsement dicta and takes a narrow view of "exceeding authorized access." *See Energy Power Co. v. Xiaolong Wang*, No. 13-11348-DJC, 2013 U.S. Dist. LEXIS 170193, at *9-14 (D. Mass. Dec. 3, 2013) (summarizing the split of district court opinion); *Advanced Micro Devices, Inc. v. Feldstein*, 951 F. Supp. 2d 212, 217 (D. Mass. 2013) (same).  A narrow interpretation is supported by an en banc decision of the Ninth Circuit, *United States v. Nosal*, 676 F.3d 854 (9th Cir. 2012), which concluded that "the phrase 'exceeds authorized access' in the CFAA does not extend to violations

---

[7]      An exception is § 1030(a)(6)(A), the password violation subsection, which presupposes that the accessor has no right of access to the computer itself.  18 U.S.C. § 1030(a)(6)(A) ("knowingly and with intent to defraud traffic[k]s . . . in any password or similar information though which a computer may be accessed without authorization, if (A) such trafficking affects interstate or foreign commerce. . . .").

of use restrictions." *Id.* at 863; *see also Advanced Micro Devices*, 951 F. Supp. 2d at 217 ("Proponents of a narrower interpretation suggest that Congress' intent in passing the CFAA was to address computer hacking activities and not to supplement state misappropriation of trade secrets law") (citing *Nosal*, 676 F.3d at 857); *Wentworth-Douglass Hosp. v. Young & Novis, P.A.*, Case No. 10-cv-120-SM, 2012 U.S. Dist. LEXIS 90446 (D.N.H. June 29, 2012) (also following *Nosal*'s narrow interpretation of CFAA).  By contrast, other courts have interpreted *EF Cultural* as calling for a "broader reading of the statute" and held that the "use and abuse" of proprietary information "without authorization" or in excess of "authorized access" violates the CFAA.  *See e.g.*, *Guest-Tek Interactive Entm't Inc. v. Pullen*, 665 F. Supp. 2d 42, 46 (D. Mass. 2009).

As the district court in Massachusetts observed, "[t]he CFAA is anything but a well-settled area of law" and "courts in different circuits have adopted significantly different interpretations of this act of the past decade." *Advanced Micro Devices*, 951 F. Supp. 2d at 217 (collecting cases).  One issue is that the CFAA is both a criminal and civil statute, and the courts have been concerned about criminalizing otherwise innocuous internet meanderings and information acquisitions.  *Id.* at 218 (discussing "undesirable consequences" of a broad construction including "potentially transforming idle internet browsing at work into a federal crime") (citing *Nosal*, 676 F.3d at 860).  The narrower Ninth Circuit view, for example, arose in the context of an indictment under the criminal provisions of 18 U.S.C. § 1030 of a former employee who encouraged still-employed individuals to access the company's computers and

transfer confidential information to the defendant so that he could start up a competing business. *Nosal*, 676 F.3d at 856. The potential problem is compounded by the importation of the terms of a confidentiality agreement entered into between two businesses or between a business and an employee into the substantive provisions of a criminal statute.[8]

Nevertheless, the "exceeds authorized access" is broad enough to survive the motion to dismiss based on the situation alleged in the Complaint where people with some authorized access enter into an area of a computer—here a protected software program not owned, but merely licensed, by the owner of the computer—and decode it in order to steal its capacity. *See Enargy Power*, 2013 U.S. Dist. LEXIS 170193, at *14 ("[T]he key issue is whether Wang's alleged access here exceeded his authority to access Enargy's server").

Anthem's second argument is that Workgroup failed to allege a loss cognizable under the CFAA. *Def.'s Mot.* at 16. Here, the answer from the First Circuit seems clear: Workgroup's alleged loss of its contract with Anthem, the transfer of the information in its software program without compensation to Anthem, and the

---

[8]       In *Nosal*, the Ninth Circuit applied the rule of lenity in interpreting the statute. *Nosal*, 676 F.3d at 863. The Ninth Circuit observed that the rule of lenity requires "penal laws . . . to be construed strictly." *Id.* (quoting *United States v. Wiltberger*, 19 U.S. (5 Wheat.) 76, 95 (1820)). One question is whether the rule of lenity should be extended to the civil portion of the statute. In *Esquivel-Quintana v. Lynch*, No. 15-3101, 2016 U.S. App. LEXIS 646 (6th Cir. Jan. 15, 2016), the Sixth Circuit wrote that "[a]n increasingly emergent view asserts that the rule of lenity ought to apply in civil cases involving statutes that have both civil and criminal applications." *Id.* at *7-8 (citations omitted). The *Esquivel-Quintana* Court explained that "statutory terms should not have different meanings in different cases—'a statute is not a chameleon.'" *Id.* at *8 (quoting *Carter v. Welles-Bowen Realty, Inc.*, 736 F.3d 722, 730 (6th Cir. 2013) (Sutton, J., concurring)). Also, "ambiguous statutes must be construed in favor of defendants under the rule of lenity." *Id.* Even applying the rule of lenity, the Court's conclusion remains the same.

reduction in value and commercial viability of the Workgroup iAutomate software program, all are losses within the First Circuit's interpretation of the term. *EF Cultural*, 274 F.3d at 585 ("The word 'loss' means 'detriment, disadvantage, or deprivation from failure to keep, have or get'") (quoting THE RANDOM HOUSE DICTIONARY OF THE ENGLISH LANGUAGE 1137 (2d ed. 1983)).

Anthem's final contention is Workgroup failed to effectively allege any of the "required (c)(4)(A)(i) factors." *Def.'s Mot.* at 16-17. Here, the Court is confused. The "(c)(4)(A)(i) factors" are factors that potentially enhance the criminal punishment, such as physical injury to any person or a threat to public health or safety. The Court is unclear how this criminal penalty provision applies to the part of § 1030 that provides for a civil action.

The answers to two of Anthem's issues seem apparent. The answer to Anthem's first contention—computer access—seems less so. At the very least, the Court views Anthem's first issue as raising questions better addressed in a motion for summary judgment upon a more complete record and more detailed briefing.

### H.    Count V: The RICO Claim

In Count V, Workgroup alleged that Anthem violated the RICO statute by engaging in a "pattern of racketeering activity" with Cognizant "by causing or participating in repeated acts of wire fraud." *Compl.* ¶ 160. Anthem argues that Workgroup's claim should be dismissed "because the predicate acts of 'racketeering' that Workgroup alleges are specifically authorized by the Contract and because Workgroup has not plausibly alleged an 'enterprise,' a 'pattern' of racketeering

58

activity, or any injury directly related to the 'racketeering' conduct." *Def.'s Mot.* at 17-21.

"To state a RICO claim, plaintiffs must allege four elements: '(1) conduct, (2) of an enterprise, (3) through a pattern, (4) of racketeering activity.'" *Giuliano v. Fulton*, 399 F.3d 381, 386 (1st Cir. 2005) (quoting *Kenda Corp. v. Pot O'Gold Money Leagues, Inc.*, 329 F.3d 216, 233 (1st Cir. 2003) (quoting *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496 (1985))). "'Racketeering activity' means any act that violates one of the federal laws specified in the RICO statute, *see* 18 U.S.C. § 1961(1), including the mail and wire fraud statutes, 18 U.S.C. §§ 1341 and 1343." *Id.*

Anthem first argues that Workgroup failed to properly allege "racketeering" based on "wire fraud." *Def.'s Mot.* at 17. "[T]he elements of wire fraud are 'a scheme to defraud,' the accused's 'knowing and willful participation in the scheme with the intent to defraud,' and the use of interstate or foreign 'wire communications' to further that scheme." *United States v. DiRosa*, 761 F.3d 144, 150-51 (1st Cir. 2014) (footnote omitted) (quoting *United States v. Denson*, 689 F.3d 21, 24 (1st Cir.2012)). "The conduct must 'be intended to deceive another, by means of false or fraudulent pretenses, representations, promises, or other deceptive conduct.'" *Bonilla v. Volvo Car Corp.*, 150 F.3d 62, 66 (1st Cir. 1998) (emphasis in original) (quoting *McEvoy Travel Bureau, Inc. v. Heritage Travel, Inc.*, 904 F.2d 786, 791 (1st Cir.1990)). Here, Workgroup claims that, without Workgroup's permission and contrary to its confidentiality agreements, Anthem devised a scheme to defraud Workgroup and commissioned Cognizant to access Workgroup's iAutomate program, with the express

purpose of reverse engineering iAutomate and expropriating the software for Anthem's own use and benefit and that in order to perform its mission, Cognizant "transmit[ted] by means of wire . . . in interstate or foreign commerce, more than a thousand fraudulent logins to the iAutomate web-based application server in furtherance of [Anthem's] scheme to defraud Workgroup." *Compl.* ¶¶ 159-61. The Court concludes that these allegations are sufficient to state a claim of racketeering based on wire fraud.

Anthem also asserts that there is no viable allegation of a RICO "enterprise." *Def.'s Mot.* at 18-19. Anthem points to caselaw that requires each entity to share a common purpose and not operate at arms' length on separate agendas. *Id.* at 19 (citing *United Food & Commercial Workers Unions & Emp'rs Midwest Health Benefits Fund v. Walgreen Co.*, 719 F.3d 849, 855 (7th Cir. 2013); *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 374-75 (3d Cir. 2010)). But Workgroup has alleged that both Anthem and Cognizant benefitted from entering into their joint scheme: "Anthem by obtaining a complete revision of Subro 2000 incorporating iAutomate's proprietary and confidential features, and Cognizant by gaining access to iAutomate's proprietary and confidential features for its own commercial benefit." *Pl.'s Opp'n* at 30. The United States Supreme Court has held on multiple occasions that the definition of "enterprise" found in the RICO statute, 18 U.S.C. § 1961(4), must be interpreted broadly. *Boyle v. United States*, 556 U.S. 938, 944 (2009); *Nat'l Org. for Women, Inc. v. Scheidler*, 510 U.S. 249, 257 (1994).

Anthem correctly identifies a potential weakness in Workgroup's RICO theory of liability, namely that Anthem and Cognizant were conducting their own affairs, not the enterprise's affairs. *Reves v. Ernst & Young*, 507 U.S. 170, 185 (1993). Nevertheless, the allegations are sufficient to survive dismissal because Workgroup claims that Anthem and Cognizant did not operate at arms' length and instead effectively conspired together to benefit each other to Workgroup's detriment.

Anthem also claims that Workgroup failed to allege a "pattern" of racketeering activity. "At least two acts of racketeering activity must occur within ten years of each other to constitute a 'pattern.'" *Giuliano*, 399 F.3d at 386 (citing 18 U.S.C. § 1961(5)). "The Supreme Court has construed the pattern element as additionally requiring a showing that 'the racketeering predicates are related, *and* that they amount to or pose a threat of continued criminal activity.'" *Id.* at 386-87 (emphasis in original) (quoting *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 239 (1989)). "This is the so-called 'continuity plus relationship' standard." *Id.* at 387 (citing *Efron v. Embassy Suites (P.R.), Inc.*, 223 F.3d 12, 15 (1st Cir. 2000)).

Anthem's main point here is that RICO was not enacted to address a "single narrow criminal episode." *Sys. Mgmt., Inc. v. Loiselle*, 303 F.3d 100, 105 (1st Cir. 2002) (citing *Apparel Art Int'l, Inc. v. Jacobson*, 967 F.2d 720, 723 (1st Cir. 1992)). This is true "even if that single criminal episode involves behavior that amounts to several crimes (for example, several unlawful mailings)." *Apparel Art*, 967 F.2d at 723. RICO does not reach a criminal enterprise whose efforts are all addressed to "one contract and did not comprise or threaten 'the kind of "continued" criminal

activity at which the RICO statute was aimed.'" *Sys. Mgmt.*, 303 F.3d at 106 (quoting *Apparel Art*, 967 F.2d at 724). Here, Workgroup's response is weak. *Pl.'s Opp'n* at 24. Workgroup merely points out the extensive nature of Cognizant's engineering activity and Anthem's refusal to admit its illegal conduct. *Id.*

In *Giuliano*, the First Circuit gave some helpful guidance to the assessment of this factor. 388 F.3d at 387-89. The *Guiliano* Court noted that the Supreme Court has "identified two methods for establishing continuity"; there is the "closed-ended" approach and the "open-ended" approach. *Id.* at 387. Under the closed-ended approach, continuity "is established by showing 'a series of related predicates extending over a substantial period of time' that 'amount to' a threat of continued criminal activity." *Id.* (quoting *H.J.*, 492 U.S. at 242). To fit under this rubric, a plaintiff must allege a "temporal duration . . . and [an] alleged number of predicate acts . . . so extensive that 'common sense compels a conclusion of continuity.'" *Id.* (quoting *Efron*, 223 F.3d at 18). Thus, the First Circuit rejected a RICO claim based on "only a single scheme by the defendants" where there was no evidence of plans for the defendants to act against another company. *Kenda*, 329 F.3d at 233. In terms of duration, the Supreme Court rejected a RICO claim of only "a few weeks or months," *H.J. Inc.*, 492 U.S. at 242, and the First Circuit rejected a RICO claim where the criminal activity lasted thirteen months. *J.D. Marshall Int'l, Inc. v. Redstart, Inc.*, 935 F.2d 815, 820 (1st Cir. 1991) ("a relatively short period of time").

In *Efron*, the First Circuit listed a number of factors to consider when determining whether a broad, continuous pattern of criminal activity exists: (1)

whether there were single or multiple victims; (2) whether the defendant's acts were limited to a single scheme or multiple schemes; (3) the duration of the scheme; and (4) whether the scheme had a singular, fixed objective and finite end point or whether it threatened to continue indefinitely. *Efron*, 223 F.3d at 18.

Here, Workgroup has not alleged that Anthem and Cognizant had more than one victim; it has alleged that the duration of their efforts against Workgroup ran only four to five months—from May through September 2013, according to the Complaint. *Compl.* ¶¶ 60-70 ("Between June 17, 2013 and September 30, 2013"), ¶¶ 161-62 ("No later than May 2013"). There is no allegation of multiple schemes or that Anthem and Cognizant intended to repeat their performance. Instead, it appears that the object of the Anthem-Cognizant effort was solely Workgroup and its software program, iAutomate. A four to five month enterprise with one victim is not enough under the closed-end approach. *Giuliano*, 399 F.3d at 387 ("[W]here the period of time is short, continuity can never be established").

Nor has Workgroup alleged enough facts to fit within the "open-ended" approach. To fit under that method, a plaintiff must allege that the "racketeering acts themselves include a specific threat of repetition extending indefinitely into the future [or] . . . are part of an ongoing entity's regular way of doing business." *Id.* The Complaint does not claim that there was any threat of repetition or that the acts are part of Anthem's regular way of doing business. *See Soto-Negrón v. Taber Partners I*, 339 F.3d 35, 38-39 (1st Cir. 2003) (dismissing RICO claim for similar reasons).

In short, the Court concludes that Workgroup has not stated a claim of a pattern of racketeering sufficient to support a RICO action against Anthem and the Court dismisses Count V, the RICO count.

## I.   Count VII: Trespass to Chattel

In Count VII, Workgroup claims that Anthem trespassed on its chattel, namely its iAutomate software program. *Compl.* ¶¶ 169-72.  In its motion to dismiss, quoting *Pearl Investments, LLC v. Standard I/O, Inc.*, 257 F. Supp. 2d 326, 354 (D. Me. 2003), Anthem says that "[a] trespass to chattels occurs when one party intentionally uses or intermeddles with personal property in rightful possession of another without authorization." *Def.'s Mot.* at 21.  Anthem contends that Workgroup failed to state a claim under this tort because Anthem owned the computer and therefore Anthem could not trespass on its own property.  *Id.*  Also, Anthem argues that the trespass to chattels theory has been displaced by the MUTSA.  *Id.* (quoting 10 M.R.S. § 1548).

The Court disagrees with Anthem on its main point that it cannot trespass on Workgroup's software because Anthem owned the computer and had contractually negotiated for authorized access to its iAutomate program.  As Workgroup continued to own the iAutomate program, Anthem's right of access to that software program was conditioned upon its usage in accordance with the purpose of the agreement.  Workgroup has claimed that Anthem entered into its program in order to steal it, which—if proved—could constitute a trespass onto Workgroup's, not Anthem's, personal property.

Turning to the preemption point, section 1548 of title 10 of the Maine Revised Statutes provides:

> 1. NO EFFECT.  Except as provided in this section, this Act displaces conflicting tort, restitutionary and other laws of this State providing civil remedies for misappropriation of a trade secret.  This Act does not affect:
>> A.  Contractual remedies, whether or not based upon misappropriation of a trade secret;
>> B.  Other civil remedies that are not based upon misappropriation of a trade secret;
>> C.  Criminal remedies, whether or not based upon misappropriation of a trade secret;
>> D.  The duty of any person to disclose information where expressly required by law; or
>> E.  The provisions of the Maine Tort Claims Act, Title 14, chapter 741.

10 M.R.S. § 1548.  The flaw in Anthem's argument dovetails with its argument against the application of MUTSA to the facts in this case.  If, as Anthem elsewhere argues, MUTSA does not apply to the allegations in this Complaint, Workgroup would presumably be allowed to proceed with its trespass to chattels claim.  Count VII is merely pleading in the alternative.  *See Fitzpatrick*, 630 F. Supp. 2d at 106 (D. Me. 2009); *Alpha Pro Tech v. VWR, Int'l LLC*, 984 F. Supp. 2d 425, 447-48 (E.D. Pa. 2013) ("For example, in this case, if the Court were to dismiss plaintiff's conversion claim and later make the finding that, although plaintiff had proved that the defendants took its pricing structure and business proposals, such information was not a protected trade secret under the [Pennsylvania Trade Secrets Act], the Court would be in the difficult position of telling the plaintiff that it had no remedy") (quoting *Cenveo Corp. v. Slater*, No. 06-2632, 2007 U.S. Dist. LEXIS 9966, at *11 (E.D. Pa. Feb. 12, 2007)).

## V.    CONCLUSION

The Court GRANTS in part and DENIES in part Defendant Anthem, Inc.'s Motion to Dismiss the Complaint (ECF No. 15).  The Court GRANTS Anthem, Inc.'s Motion to Dismiss Count V, the Racketeer Influence in Corrupt Organizations Act claim; otherwise, the Court DENIES Anthem, Inc.'s Motion to Dismiss.

SO ORDERED.

/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
UNITED STATES DISTRICT JUDGE

Dated this 3rd day of February, 2016